**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, bodies politic and corporate, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 21 CV 50341<br>) |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) Judge Phillip G. Reinhard<br>)<br>) Magistrate Judge Lisa A. Jensen<br>) |
| Defendant. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR A PRELIMINARY INJUNCTION**

On August 2, 2021, Governor Pritzker signed into law the Illinois Way Forward Act. Among other things, the Act requires that any local governmental unit in Illinois having an agreement with the United States government to house civil immigration detainees must exercise the termination provision of such agreement no later than January 1, 2022. The Act is unconstitutional in that it violates the Supremacy Clause of the United States Constitution and violates the principle of intergovernmental immunity.

**Background**

Congress has authorized the U.S. Attorney General to provide for the "housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreement with State or local units of government or contracts with private entities." 18 U.S.C. § 4013(a)(3). Congress has also authorized the Attorney General, in his "reasonable discretion," to carry out the activities of the Department of Justice "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4). See also *id.* § 530C(b)(7).

In addition, Congress has directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal, 8 U.S.C. § 1231(g)(1), and it has instructed that Immigration and Customs Enforcement ("ICE") "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility" *Id.* § 1231(g)(2).

In 2003, McHenry County entered into an Intergovernmental Cooperative Agreement with the United States Marshals Service and the Immigration and Naturalization Service, the forerunner of ICE. Under that agreement, McHenry County receives a per diem for each ICE detainee housed. A revised Detention Services Intergovernmental Agreement was entered into in 2014 and continues in force to this day (the "McHenry County Agreement").[1] For the fiscal years 2016-2020, the McHenry County Jail housed, on average, 240 ICE detainees per day. Affidavit of Bill Prim at ¶ 3.[2] This has resulted, for these five fiscal years, in more than $41 million of revenue for McHenry County, over $8 million each year. *Id.*

Similarly, on or about December 1, 2004, Kankakee County entered into an Intergovernmental Service Agreement with the United States Marshals Service to house federal prisoners at the Jerome Combs Detention Center, in exchange for the payment of a per diem for each such detainee housed (the "Kankakee County Agreement").[3] In October 2016, Kankakee County began housing ICE detainees in addition to other federal detainees. Affidavit of Michael

---

[1] A copy of the McHenry County Agreement is attached to the Amended Complaint as Exhibit A.

[2] The Affidavit of Bill Prim is attached to this Memorandum of Law as Exhibit 1.

[3] A copy of the Kankakee County Agreement is attached to the Amended Complaint as Exhibit B.

Downey at ¶ 2.[4] The Kankakee County Agreement has been renewed from time to time, most recently on March 1, 2019. *Id.* For the fiscal years 2017 through 2020, the Jerome Combs Detention Center housed, on average, 122 ICE detainees per day. *Id.* ¶ 3. This has resulted, for these four fiscal years, in nearly $16 million of revenue for Kankakee County, nearly $4 million per year. *Id.*

The McHenry County Agreement does not provide a specific duration, but may be terminated by either party upon 30 days' written notice. McHenry County Agreement at 3. The Kankakee County Agreement specifies a duration of 48 months and is also terminable by either party upon 30 days' written notice. Kankakee County Agreement at 1, 3.

The Illinois Way Forward Act, which was signed into law by Governor Pritzker on August 9, 2021, provides, in relevant part, as follows:

> (1) No law enforcement agency, law enforcement official, or any unit of state or local government may enter into or renew any contract, intergovernmental service agreement, or any other agreement to house or detain individuals for federal civil immigration violations.
>
> (2) Any law enforcement agency, law enforcement official, or unit of state or local government with an existing contract, intergovernmental agreement, or other agreement, whether in whole or in part, that is utilized to house or detain individuals for civil immigration violations shall exercise the termination provision in the agreement as applied to housing or detaining individuals for civil immigration violations no later than January 1, 2022.

5 ILCS 805/15(g)(1), (2).

The Illinois Way Forward Act provides for enforcement as follows:

> Upon his or her own information or upon the complaint of any person, the Attorney General may maintain an action for declaratory, injunctive or any other equitable relief in the circuit court against any law enforcement agency, law enforcement official, or other person or entity who violates any provision of this Act. These remedies are in addition to, and not in substitution for, other available remedies.

---

[4] The Affidavit of Michael Downey is attached to this Memorandum of Law as Exhibit 2.

3

5 ILCS 805/30(b).

## ARGUMENT

As articulated by the Supreme Court,"[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Seventh Circuit, if the plaintiff shows that it is likely to succeed on the merits and that its remedy at law is inadequate, "the court weighs the harm of denying an injunction to the plaintiff against the harm to the defendant of granting one. . . . This balancing test is done on a sliding scale: 'If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor.. . .' In balancing the harms, the court also considers the public interest." *Life Spine, Inc. v. Aegis Spine, Inc.*, 2021 U.S. App. LEXIS 23526 at 14 (7th Cir.), quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). As demonstrated below, the plaintiffs are entitled to a preliminary injunction under the prevailing law.

I. **Plaintiffs are Likely to Succeed on the Merits.**

    A. **The Way Forward Act is Preempted.**

        1. **Preemption Generally**

The Supremacy Clause of the United States Constitution provides as follows:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI.

The Supreme Court has recognized three types of preemption. First, by including a preemption clause in a statute making it clear it intends to occupy an entire field of regulation,

4

Congress can expressly preempt state law. *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S.Ct. 1938, 1945 (2016). Second, "field preemption" exists when Congress's intent to occupy a field "can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "Control over immigration and naturalization is entrusted exclusively to the Federal Government and a State has no power to interfere." *Nyquist v. Mauclet,* 432 U.S. 1, 10 (1977). Finally, "conflict preemption" exists when state laws conflict with federal law, including when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The test under conflict preemption is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

### 2. Field Preemption

The federal government's broad power over immigration rests on its constitutional power to "establish [a] uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, its power to "regulate Commerce with foreign Nations'" *id.*, cl. 3, and its inherent sovereign power to control and conduct foreign relations. *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *Arizona*, 567 U.S. at 394-95. "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." *Id.* at 401. As the Court held in the seminal case of *Hines v. Davidowitz*,

> When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as

such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute . . .

312 U.S. at 62.

Congress granted to the federal government the exclusive power over the arrest and detention of aliens. 8 U.S.C. § 1226.[5] In furtherance of that power, Congress directed that the Attorney General "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" including "lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." *Id.* §§ 1231(g)(1)(2). *Committee of Cent. Amer. Refugees v. Immigration & Naturalization Serv.,* 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress has placed the responsibility of determining where aliens are detained within the discretion of the Attorney General"), as amended on denial of rehearing 807 F.2d 769 (9th Cir. 1987); *Gandarillas-Zambrana v. Board of Immigration Appeals,* 44 F.3d 1251, 1256 (4th Cir. 1995) ("[t]he INS necessarily has the authority to determine the location of detention of an alien in deportation proceedings"); *Calderon v. Moyers*, 558 F.Supp. 19, 21 (N.D. Ill. 1982) ("[t]he law indicates that the choice of the locations of the detention and the exclusion hearing are within the discretion of the INS"), citing 8 U.S.C. §§ 1223, 1225.

Furthermore, by statute, Congress specifically authorized cooperative agreements with units of local government to house immigration detainees. 8 U.S.C. § 1103(a)(11)(B). The plaintiffs' contracts with ICE to house federal detainees are authorized under the Department of Justice Appropriations Act of 2001 (Public Law 106-553). The federal government has preempted the field of detaining and housing aliens such that the Illinois Way Forward Act cannot nullify the plaintiffs' contracts. *Sanchez-Soriano v. United States,* 2011 U.S. Dist. LEXIS

---

[5] 8 U.S.C. § 1103(a)(3) provides that the "Secretary of Homeland Security shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens . . .."

146977 at *6 (S.D. Ill. Aug. 2, 2011) ("ICE has authority to detain aliens in non-federal facilities pursuant to an IGSA [intergovernmental service agreement]").

In *American Civil Liberties Union of New Jersey, Inc. v. County of Hudson,* 352 N.J. Super. 44 (N.J. Super. App. Div. 2002), plaintiff sued under common law and New Jersey's access to public records laws to obtain information "as to all persons confined in the Hudson County Jail and the Passaic County Jail since September 1, 2001." 352 N.J. Super at 56. The county jails had contracts with the Immigration and Naturalization Service, the predecessor to ICE, to secure, house, and provide subsistence for INS detainees. *Id.* at 58. INS directed one of the jails not to release the information and the other jail maintained that since the detainees were under the sole authority of the federal government it too would not disclose the information. *Id.* at 59-60.

The trial court entered judgment in favor of the plaintiffs, requiring the jails to disclose the requested information. Five days after judgment was entered, the INS promulgated a regulation barring disclosure of the information sought. The federal government was granted leave to intervene and argued on appeal that the newly-enacted regulation preempted New Jersey's public disclosure statutes. *Id.* at 61. Finding that the regulation preempted state law, the appellate court reversed, in language applicable to the case before this Court.

> The power to regulate matters relating to immigration and naturalization resides exclusively in the federal government. The State simply has no constitutionally recognized role in this area. Thus, *while the State possesses sovereign authority over the operation of its jails, it may not operate them, in respect of INS detainees, in any way that derogates the federal government's exclusive and expressed interest in regulating aliens.*

*Id.* at 87-88 (emphasis added).

No matter how one characterizes the Illinois Way Forward Act—as a limitation on the Attorney General's congressionally delegated authority, or as an interference with the federal

7

government's ability to contract with local governments whose facilities are deemed "appropriate places of detention," 8 U.S.C. § 1231(g)(1), or both—it clearly nullifies federal law. The Illinois Way Forward Act is an impermissible infringement on the federal government's exclusive authority to regulate immigration and is, therefore, preempted.

### 3. Conflict Preemption

Conflict preemption applies where a state statute "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 406, quoting *Hines*, 312 U.S. at 67. State laws are also preempted "where compliance with both federal and state regulations is a physical impossibility." *Florida Lime*, 373 U.S. at 142-43.

Federal regulations relating to the housing of immigration detainees show a clear preference by Congress to utilize existing facilities over the construction of new facilities. 8 U.S.C. § 1231(g) provides:

> (g) Places of detention
>
> (1) In general
>
> The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend…amounts necessary to acquire, build, remodel, repair and operate facilities…necessary for detention.
>
> (2) Detention facilities of the Immigration and Naturalization Service
>
> Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail detention center or other comparable facility.

As noted above in the section on field preemption, Congress also clearly authorizes agreements with local governments for the housing of detainees as a way to further these

8

purposes. The Illinois Way Forward Act stands as an obstacle to the execution of the full purposes of Congress reflected in section 1231(g). Congress clearly authorized the Attorney General to use local government detention facilities, but the Illinois Way Forward Act forecloses the Attorney General from doing so in clear contravention of Congress' clear and manifest objective that that option be available. Accordingly, the Illinois Way Forward Act is conflict preempted as applied to plaintiffs' contracts with ICE.

### B. Intergovernmental Immunity

In *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819), the Supreme Court held that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the national government."

The decision of the Supreme Court in *McCulloch* established the principle of intergovernmental immunity. Accordingly, a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). The Illinois Way Forward Act directly regulates the federal government by nullifying its contracts with plaintiffs to house ICE detainees. See, *e.g., Public Utilities Comm'n of California v. United States,* 355 U.S. 534, 544-45 (1958) (striking down state law that sought to regulate shipments of government property into state); *United States v. City of Arcata,* 629 F.3d 986, 991 (9th Cir. 2010) (holding unconstitutional state law that attempted to regulate military recruiting practices directed to persons under the age of 18).

The Supreme Court has held that federal contractors are treated the same as the federal government regardless of employment status and that state regulation of activities which are

9

inherently federal performed by federal contractors is an impermissible direct regulation of the federal government. *Public Utilities Comm'n of California*, 355 U.S. at 545.

In the context of a county contracting with the federal government for the housing of federal detainees, the Illinois Way Forward Act directly regulates the federal government in violation of the principle of intergovernmental immunity by prohibiting the federal government's contractors, McHenry and Kankakee counties, from performing an inherently federal activity, immigration detention. This direct regulation is further compounded by the fact that the Private Detention Facility Moratorium Act, Illinois Public Act 101-0020, also restricts the federal government from using private detention centers for housing immigration detainees. In conjunction, the Illinois Way Forward Act and P.A. 101-0020 prohibit the federal government from using any third party to house immigration detainees and forces the government to utilize Congress' last resort for such detention which is building and operating a detention center using federal funds and employees.

Invalidation on the ground of intergovernmental immunity can also arise when state action discriminates against the federal government or those with whom it contracts. In analyzing discrimination, the key question is whether the state law treats similarly situated persons differently. *Dawson v. Stanger*, 139 S. Ct. 698, 705 (2019). State laws that treat similarly situated state and federal contractors differently are not valid. The Illinois Way Forward Act discriminates against the federal government because only the federal government is responsible for immigration detention, which is the only detention activity regulated by the Illinois Way Forward Act and because there is no prohibition on state actors, like other counties or the IDOC, contracting with county jails for detention services.

## II. Plaintiffs Will Suffer Irreparable Harm if a Preliminary Injunction is Not Granted.

If the plaintiffs are forced to terminate their contracts with the federal government while this case is pending, ICE will have to re-locate its detainees to other states, either near to or far from Illinois. Once re-located, it is unlikely that ICE would be interested in housing detainees in plaintiffs' jails as it will have made arrangements with detention facilities in other states. There is certainly no guarantee that ICE would do so. Additionally, termination of the contracts may result in organizational changes by the counties which may not be easily re-dressed in the event the plaintiffs prevail after a trial. For example, in the absence of the contracts, the counties will need to lay off excess staff associated with ICE detention. Aff. of Bill Prim at ¶ 6; Aff. of Michael Downey at ¶ 6. The counties may also need to increase taxes or reduce county services to compensate for the diminished revenues. Aff. of Bill Prim at ¶ 5; Aff. of Michael Downey at ¶ 5. A preliminary injunction protects the counties from needing to make those changes until a final decision on the underlying complaint can be made. *O'Sullivan v. City of Chicago*, 396 F.3d 843, 858 (7th Cir. 2005) ("an injunction may issue to prevent future wrong, although no right has yet been violated"), quoting *Swift & Co. v. United States*, 276 U.S 311, 326 (1928).

Once the federal government re-locates immigration detainees to facilities in other states, the plaintiffs will no longer have a relationship with ICE, even if plaintiffs prevail after a trial on the merits. That, too, is an injury that may not be redressable if an injunction is not issued. *Manpower, Inc. v. Mason*, 377 F.Supp.2d 672, 677 (E.D. Wis. 2005) ("even if defendants prevail at trial, it is unlikely that they will be able to simply pick up where they left off when they were terminated").

The revenue generated by the plaintiffs' contracts with ICE allows the plaintiff counties to fund county government, which provides essential services to residents, without increasing the

tax burden. Without the revenue, not only will jobs be lost, but county services may need to be cut, or taxes increased. Aff. of Bill Prim at ¶ 5; Aff. of Michael Downey at ¶ 5. Typically, monetary loss does not constitute irreparable harm if the injunction is not granted because a successful plaintiff can be adequately compensated at the conclusion of the litigation. *Classic Components Supply, Inc. v. Mitsubishi Elec. Am., Inc.*, 841 F.2d 163, 164-65 (7th Cir. 1988). Here, however, plaintiffs have no remedy at law, as a claim for money damages is barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Edelman v. Jordan*, 415 U.S. 85 (1974).

### III. The Balance of Equities Favors Plaintiffs and Issuance of the Injunction is in the Public Interest.

After establishing that plaintiffs have some likelihood of success on the merits and that plaintiffs will suffer irreparable harm for which there is no adequate remedy at law if a preliminary injunction is not granted, the court shifts its analysis to a "balancing phase." *Cassell v. Snyders,* 990 F.3d 539, 545 (7th Cir. 2021). In this phase the court assesses "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; . . . and the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.*, quoting *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

In this analysis the court employs a "sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018), quoting *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir. 1984). "'Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts

12

have termed the "public interest").'" *Valencia,* 833 F.3d at 966, quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

The harm suffered by plaintiffs far outweighs any benefit gained by the State of Illinois if the provisions of the Illinois Way Forward Act requiring cancellation of the county contracts is not stayed. Additionally, entry of a preliminary injunction is in the public interest because of the probable hardship cancellation of the contracts will impose on immigration detainees and their families.

When signing the Illinois Way Forward Act into law, Illinois Governor J.B. Pritzker commented that "Throughout my governorship I've directed my administration to adopt policies that make Illinois a welcoming state for immigrants, and I am proud to sign these accountability measures into law to advance our cause." Forcing the cancellation of the county contracts with ICE for immigrant detention is nothing more than a political statement by the Illinois legislature that it disagrees with current federal immigration policy. The benefit gained by the State of Illinois in codifying its moral indignation at the federal government's decision to detain certain immigrants while they await deportation or decisions in their immigration court proceedings is merely philosophical when compared to the concrete harms suffered by plaintiffs and the very people the law claims to protect.

If a preliminary injunction is not granted and the counties are forced to cancel their contracts, there will be an immediate and quantifiable harm since the plaintiffs will lose $12 million annually, which will have to be made up by increasing the tax burden on McHenry and Kankakee county residents. Aff. of Bill Prim at ¶ 4-5; Aff. of Michael Downey at ¶ 4-5. In addition, many good paying jobs for Illinois citizens will be lost. Aff. of Bill Prim at ¶ 6; Aff. of Michael Downey at ¶ 6. Moreover, there is no guarantee that the counties will ever be able to

reestablish a contractual relationship with the federal government for detention services if denial of an injunction is later overturned. Illinois' previous action to ban private detention facilities in the state will result in the likely permanent relocation of ICE detainees currently housed in McHenry and Kankakee counties to other states, away from many of their families and legal counsel. When weighed against Illinois' abstract hardship of a delay in being known as "welcoming," the only hardship faced by defendant by a preliminary injunction, the harm to plaintiffs and the public interest clearly favor the granting of a preliminary injunction.

### IV. The Preliminary Injunction Should Issue Without Bond.

Rule 65(c), Fed. R. Civ. Pro. provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although the rule seems absolute, the Seventh Circuit has held that whether to require a bond rests in the sound discretion of the district court. *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). Here, it is hard to conceive of any damage the defendant may incur if it is later determined that plaintiffs are not entitled to permanent relief. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) ("The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him"). The only possible injury will be to the plaintiffs if an injunction is not granted. Accordingly, plaintiffs request that the preliminary injunction issue without bond.

McHenry County, Illinois and<br>
Kankakee County, Illinois<br>
<br>
By: /s/ George M. Hoffman<br>
One of their attorneys

Patrick D. Kenneally (ARDC No. 6286573)
McHenry County State's Attorney
George M. Hoffman (ARDC No. 6180738)
Jana Blake Dickson (ARDC No. 6305741)
Assistant State's Attorneys
McHenry County Government Center
2200 North Seminary Avenue
Woodstock, Illinois 60098
815-334-4159 (phone)
815-334-0872 (fax)
gmhoffman@mchenrycountyil.gov
jeblake@mchenrycountyil.gov

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of Plaintiffs' Memorandum of Law in Support of Motion for a Preliminary Injunction was served on

Eileen Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph St., 11th Floor
Chicago, IL 60601-3218
eileen.boyleperich@ilag.gov

by depositing a copy in the United States mail located at 2200 N. Seminary Ave., Woodstock IL 60098 and by electronic mail on September 30, 2021.

/s/ George M. Hoffman