IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, | |
| Plaintiffs, | No. 21-cv-50341 |
| v. | Judge Philip G. Reinhard |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | Magistrate Judge Lisa A. Jensen |
| Defendant. | |

**THE ATTORNEY GENERAL'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD............................................................................................................ 2

ARGUMENT ......................................................................................................................... 3

I. There is no likelihood the Counties will succeed on the merits. ..................................... 3

    A. The Counties' intergovernmental immunity claim fails. ........................................ 4

    B. The Counties' preemption claim fails................................................................... 5

        1. Section 15(g) is not field-preempted............................................................. 6

        2. Section 15(g) does not conflict with federal law. ........................................ 8

II. The Counties will not be irreparably injured absent injunctive relief. .............................. 9

III. The equities tip decidedly against injunctive relief. ......................................................... 13

CONCLUSION...................................................................................................................... 15

## INTRODUCTION

McHenry and Kankakee Counties (the "Counties") seek to enjoin provisions in the Illinois Way Forward Act that require them to discontinue their lucrative agreements to confine federal civil immigration detainees in their jails. They are not entitled to an injunction because their claims fail as a matter of law; the harm they allege is monetary, not irreparable; and the balance of equities tips against disregarding state sovereignty to enjoin a state law.

The Counties' complaint suffers from a fatal flaw: It ignores the fact that as counties—subunits of the State of Illinois (the "State"), created by the State—they are subject to the State's sovereign prerogative, embodied in the Tenth Amendment, to decide whether to participate in federal programs. Both of the Counties' claims, which cite federal intergovernmental immunity and preemption, disregard this foundational principle of federalism. The Counties have identified no precedent applying federal intergovernmental immunity to a subunit of a State or, even more radically, to a subunit of a State against its creating State. The Counties' preemption claim is similarly flawed. The Counties cite no law or precedent stripping the State of its Tenth Amendment right to decline participation in federal programs, including federal immigration enforcement.

Even if the Counties' claims were not fatally weak, their injunction request would still fail because the harm they allege is not irreparable: Any lost revenue from the immigration detention agreements could be compensable as actual damages in a valid action in an appropriate forum, and the Counties fail to show that any such lost revenue is both likely and extreme. The Way Forward Act also does nothing to prevent the Counties from continuing their contracts with the U.S. Marshals Service to house federal criminal detainees and inmates. On the other hand, an injunction would inflict the very harm to state sovereignty the Tenth Amendment exists to prevent: coercing the State to use its law enforcement resources for federal purposes. The preliminary injunction motion should be denied.

1

## BACKGROUND

Plaintiffs are two Illinois counties that have entered into agreements with the U.S. Marshals Service to house federal detainees, including civil immigration detainees. ECF 7 ("Compl.") ¶¶ 1-2, 11-15.[1] Over the last four years, the Counties' agreements with the federal government have yielded roughly $12 million each year in revenue. *Id.* ¶ 11-15. The Counties filed this action to challenge the constitutionality of section 15(g) of the Illinois Way Forward Act. That section states in relevant part that "[n]o law enforcement agency" or "unit of State or local government may enter into or renew any . . . agreement to house or detain individuals for federal civil immigration violations," and directs agencies with existing such agreements to "exercise the[ir] termination provision[s]" on or before January 1, 2022. 5 ILCS 805/15(g).

The Counties' present motion seeks preliminary injunctive relief. ECF 9, 10. The Counties argue that they are likely to succeed on the merits, insofar as section 15(g) is both preempted and barred by principles of federal intergovernmental immunity. ECF 10 ("Mot.") at 4-10. And they assert they will suffer irreparable injury absent entry of an injunction, insofar as they will "lose $12 million annually" in revenue, an economic injury that "may" result in the need to increase taxes or reduce county services. *Id.* at 11, 13. That harm, they argue, "far outweighs any benefit gained by the State of Illinois" from section 15(g), because in their view section 15(g) "is nothing more than a political statement by the Illinois legislature" with little concrete effect. *Id.* at 13.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

---

[1] To avoid duplication, this discussion presumes familiarity with the memorandum of law in support of the Illinois Attorney General's motion to dismiss. *See* ECF 24.

2

the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). The Seventh Circuit examines such motions in two phases. First, the plaintiff must show that "(1) without [injunctive] relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Second, "[i]f a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it," keeping in mind that the less "likely the plaintiff is to win on the merits," the more "the balance of harms needs to weigh in his favor." *Id.*

## ARGUMENT

The Counties' motion for a preliminary injunction fails for two independent reasons: There is no likelihood that they will prevail on their claims, and they fail to demonstrate irreparable injury. Furthermore, in balancing the equities, the Counties' revenue loss cannot outweigh the State's interests in exercising its constitutional right not to participate in federal programs.

**I.    There is no likelihood the Counties will succeed on the merits.**

The Counties are not entitled to a preliminary injunction because their claims fail on the merits and should be dismissed under Rule 12(b)(6). *See* ECF 24. The Counties' assertions of intergovernmental immunity and preemption are fundamentally flawed because they usurp the State's sovereign prerogative to decline participation in federal immigration enforcement. Although the Counties, as subunits of the State, may wish to participate in federal immigration enforcement, the Tenth Amendment and the federalism principles it embodies reserve that decision to the State. Neither intergovernmental immunity nor the Supremacy Clause gives the Counties the power to veto the Way Forward Act through litigation.

3

### A. The Counties' intergovernmental immunity claim fails.

As the State has explained, ECF 24 at 5-9, the Counties cannot assert a viable claim that section 15(g) of the Way Forward Act violates the doctrine of federal intergovernmental immunity. The Counties are two subunits of the State—entities "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991) (cleaned up). They thus cannot challenge state law on the ground that it violates principles of intergovernmental immunity. And they cannot show that *this* state law violates those principles, because the State did not "discriminate" against the federal government by exercising its constitutional right not to enter into agreements to house certain federal detainees. ECF 24 at 7-9.

The Counties' basic argument is that section 15(g) discriminates against the federal government by "prohibiting [its] contractors . . . from performing an inherently federal activity, immigration detention." Mot. 10. But the State has not prohibited any third party from doing anything; the State has decided that *the State*—including its subunits—will no longer enter into agreements to house federal immigration detainees. The State has the right to do just that.

As the Supreme Court has explained, the State retains the sovereign right, reflected in the Tenth Amendment, to decide not to use its law enforcement resources to enforce federal law:

> It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. It is no more compatible with this independence and autonomy that their officers be "dragooned" . . . into administering federal law than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state laws.

*Printz v. United States*, 521 U.S. 898, 928 (1997) (cleaned up). This anti-commandeering principle, which protects the State's "choice" in how to use its "law enforcement resources," applies with full force to the State's choice "whether or not to use such resources to aid in federal immigration

4

efforts," *see City of Chi. v. Sessions*, 888 F.3d 272, 282 (7th Cir.), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. 2018). The Counties cite no precedent permitting the State's subunits to usurp this sovereign right from the State and continue participating in federal immigration enforcement initiatives—against the express instruction of the State's legislature.

The Counties have no answer to this basic point. They cite two cases concerning state laws that purported to regulate the federal government or its contractors, Mot. 9-10, but those cases have no bearing here. *Public Utilities Commission v. United States* concerned a law that directly regulated the rates that third-party carriers could earn transporting property for the federal government, requiring those rates to be "no lower than rates" generally applicable to commercial customers. 355 U.S. 534, 537 (1958). Here, by contrast, section 15(g) does not regulate any third parties at all (only the State and its subunits). *United States v. City of Arcata* is even further afield: That case concerned ordinances that purported to directly regulate the federal government, prohibiting it from conducting military recruitment in the cities in question. 629 F.3d 986, 988 (9th Cir. 2010). Illinois has not purported to bar the federal government from doing anything; the State has simply chosen not to enter into certain agreements with it.[2]

In the end, the State's exercise of its right not to participate in federal programs cannot be understood as "discrimination," because doing so would deprive the State of the anti-commandeering protection afforded by the Constitution. *See Printz*, 521 U.S. at 928.

**B.     The Counties' preemption claim fails.**

The Counties' preemption claim also fails on the merits, cannot be the basis for a preliminary injunction, and should be dismissed. ECF 24 at 9-15. The State has a constitutional

---

[2] For that reason, Counties' invocation (at 11) of the Private Detention Facility Moratorium Act, 730 ILCS 141/1 *et seq.*, also is misplaced: That statute does not regulate the federal government at all, but only "the State," "unit[s] of local government," and their agents, *id.* 141/15.

5

right, secured by the Tenth Amendment, not to participate in federal programs without its consent. *Printz*, 521 U.S. at 935. But the Counties' preemption argument would deprive the State of that right, yoking it to federal initiatives on the whim of its subunits. The Counties cite no case reaching such a backwards result. In fact, the very statutes the Counties cite reflect Congress's recognition that it cannot compel the states to provide detention facilities for federal immigration authorities.

As the Counties observe, Mot. 4-5, Congress may preempt a state law "through express language in a statute," or "implicitly," either "through 'field' pre-emption' or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015). "In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). Here, the Counties concede that no federal statute *expressly* preempts section 15(g), arguing only that that section is preempted under principles of field or conflict preemption. Mot. 5-9. No matter how the Counties' preemption claim is framed, it cannot succeed.

        **1.**        **Section 15(g) is not field-preempted.**

The Counties cannot show that section 15(g) is field-preempted. "Field preemption is rare." *Nelson v. Great Lakes Educ. Loan Servs.*, 928 F.3d 639, 651 (7th Cir. 2019). It applies only "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Id.* at 651-52 (quoting *Int'l Ass'n of Machinists Dist. Ten v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018)).

The Counties' invocation of field preemption is off base, as even their cited statutes make clear. Those statutes do not provide (for instance) that the federal government may house detainees in any state or local facility on demand. Rather, they allow the federal government to "enter into a *cooperative agreement* with any State" or its subunit for those services, 8 U.S.C. § 1103(a)(11)(B) (emphasis added), or to "purchase or lease" facilities for such use, *id.* § 1231(g)(2). Far from

6

leaving "no room for the States," *Arizona v. United States*, 567 U.S. 387, 399 (2012), the statutory regime expressly preserves States' authority to consent (or not) to housing detainees—presumably because a contrary regime, under which the federal government would have plenary authority over detention in state facilities, would be unconstitutional. *See Printz*, 521 U.S. at 935; *Geo Group, Inc. v. Newsom*, No. 20-56172, — F.4th —, 2021 WL 4538668 (9th Cir. Oct. 5, 2021) (explaining that 8 U.S.C. § 1103(a)(11)(B) "clarifies that the federal government cannot commandeer state and local governments into serving federal functions").

The Counties cite a handful of cases for the proposition that Congress has occupied the field, Mot. 5-6, but none rests on any such holding, or indeed has any bearing at all. Four of these opinions observe that Congress has "placed the responsibility of determining where aliens are detained within the discretion of the Attorney General," Mot. 6 (quoting *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986)), or something similar, but do so only in the context of rejecting noncitizens' arguments that they should have been relocated to some other detention facility. *See Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995); *Comm. of Cent. Am. Refugees*, 795 F.2d at 1440; *Sanchez-Soriano v. United States*, No. 09-cv-500, 2011 WL 6217063, at *2 (S.D. Ill. Aug. 2, 2011); *Calderon v. Moyers*, 558 F. Supp. 19, 21 (N.D. Ill. 1982). These cases rest on no preemption holding at all. The Counties' reliance on a New Jersey intermediate appellate court case, *ACLU of N.J. v. County of Hudson*, 799 A.2d 629 (N.J. App. Div. 2002), is similarly misplaced: That case considered the intersection of federal and state public-records statutes, *id.* at 654, a question of no relevance here.[3]

---

[3] To the extent the Counties intend to invoke the New Jersey court's description of "the federal government's exclusive and expressed interest in regulating aliens" in support of some argument that *all* state regulations that touch on matters of immigration policy are preempted, *see* Mot. 5, 7, that argument also fails. The Supreme Court has explained that Congress's immigration authority is exclusive only over matters at the core of its power to adopt "uniform Rule[s] of Naturalization,"

7

## 2. Section 15(g) does not conflict with federal law.

The Counties' conflict-preemption argument fares no better. As the Supreme Court has explained, "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Whiting*, 563 U.S. at 607. The Counties come nowhere close to meeting that bar. Indeed, the Counties' sole conflict-preemption argument is that section 15(g) "stands as an obstacle" to the implementation of 8 U.S.C. § 1231(g), which authorizes the U.S. Attorney General to "arrange for appropriate places of detention for aliens," including, where necessary, the "purchase or lease of any existing" facility.

But the Counties offer essentially no explanation as to why section 15(g)—which establishes a state policy of declining to lease beds in state and county detention facilities for federal civil immigration detainees—conflicts with 8 U.S.C. § 1231(g). The Counties' position appears to be that a state that declines to enter into an agreement with the federal government to house immigration detainees "obstructs" § 1231(g), or perhaps federal immigration law more generally. But the Counties identify no authority reading a state's decision to exercise its right not to participate in federal programs, *Printz*, 521 U.S. at 935, as conflict preemption. As the Ninth Circuit explained in the immigration-enforcement context, "the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020). The same rule forecloses the Counties' conflict-preemption claim here.

---

U.S. Const. art. I, § 8, cl. 4—i.e., to determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). And federal courts—including the Supreme Court—regularly find that state and local laws regulating noncitizens are not preempted. *See, e.g.*, *Kansas*, 140 S. Ct. at 807; *Arizona*, 567 U.S. at 415; *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011).

8

## II. The Counties will not be irreparably injured absent injunctive relief.

The Counties' motion should also be denied for a second reason: They fail to show that they will face irreparable injury absent injunctive relief. Because "injunctive relief [i]s an extraordinary remedy," it may be awarded only on "a clear showing" that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original); *see Mays*, 974 F.3d at 818. The Counties fall far short of meeting that demanding standard.

The Counties primarily argue that absent injunctive relief, they will face financial harm. Mot. 11-12. The Counties explain that the contracts generate "$12 million annually," revenue that will be lost if the contracts are cancelled. *Id.* at 13. This "monetary loss," the Counties contend, constitutes irreparable injury and entitles them to a preliminary injunction. *Id.* at 11-12.

The problem for the Counties is that courts universally hold that a loss of income (or, in this case, contract revenue) does not qualify as irreparable injury, because a loss of income can always be "redressed by damages . . . at the conclusion of the case." *Shegog v. Bd. of Educ. of City of Chi.*, 194 F.3d 836, 839 (7th Cir. 1999); *see Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845-46 (7th Cir. 2005). Under this rule, the Counties' "monetary loss," Mot. 12, does not entitle them to the "extraordinary remedy" of injunctive relief, *Winter*, 555 U.S. at 22. Seeking to circumvent this rule, the Counties argue that these authorities are inapposite here because the State's sovereign immunity would bar the recovery of monetary damages, Mot. 12, but that argument fails on multiple levels.

First, the Counties' lack of viable legal theories against the State should not be mistaken as a lack of legal remedies justifying injunctive relief. To be sure, sovereign immunity would bar any request for money damages in federal court. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974). But the State has waived sovereign immunity in the Court of Claims over certain claims for money damages, including "claims against the State founded upon any law of the State of Illinois,"

9

"claims against the State founded upon any contract entered into with the State of Illinois," and "claims against the State for damages in cases sounding in tort," 705 ILCS 505/8(a), (b), (d). If the Counties can articulate a viable legal theory against the State to claim contract or tort damages, they may seek recompense there. *Cf., e.g.*, *Jaffee v. State*, 32 Ill. Ct. Cl. 590, 592 (1978) (considering claim "for interference with a contractual relationship" arising out of State's impairment of bonds). The fact that the Counties are not entitled to seek damages in this Court does not mean they are entitled to injunctive relief for their anticipated monetary loss instead.

Even if the Counties are not able to fully recover their anticipated monetary loss, that would still not entitle them to injunctive relief. As many courts have explained, this argument proves too much: Were it true that "damages in a suit against a defendant with sovereign immunity" were necessarily irreparable, the irreparable-injury requirement would be "effectively eliminate[d]" in suits against the government. *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015); *accord California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335-46 (D.D.C. 2012). As a result, even in cases in which financial losses may not ultimately be recovered, these courts have held movants to their "considerable burden of proving that those losses are *certain, great and actual*." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011). As another court has explained, a movant must "make[] 'a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits,' or demonstrate[] that the loss would 'cause extreme hardship to the business, or even threaten destruction of the business.'" *Air Transp. Ass'n*, 840 F. Supp. 2d at 336; *accord Cal. Ass'n of Priv. Postsecondary Sch.*, 344 F. Supp. 3d at 171 (movant must show "severe," "extreme hardship" to warrant injunction). And "[t]o permit the Court to evaluate the nature and extent of the alleged

irreparable injury, the movant bears the burden of presenting 'specific details'" regarding its "extreme" loss. *Cal. Ass'n of Priv. Postsecondary Sch.*, 344 F. Supp. 3d at 171.

The Counties' threadbare affidavits fall far short of showing that it is "likely" that they will face "extreme" financial injuries of this nature. The Counties' primary argument, as noted, is that they will experience "monetary loss" in the amount of the "per diems" they earn for housing ICE detainees, a sum they say totals $12 million per year. Mot. 12-13; ECF 10-1 ("Prim. Aff.") ¶ 3; ECF. 10-2 ("Downey Aff.") ¶ 3. But the Counties' affidavits fail to fully substantiate this claim. For one, the Counties fail to distinguish between the revenue they earn for housing *immigration* detainees and the revenue they earn from housing *other* federal detainees, leaving uncertain whether all or some of the $12 million payments are at stake. *See* Prim Aff. ¶ 3; Downey Aff. ¶ 3. For another, the Counties fail to distinguish between lost revenue and lost profit. The Counties do not explain, for instance, how much of the per diems they receive for housing civil immigration detainees go to the cost of housing those detainees. When the Counties stop detaining immigrants, their costs will decrease too. The Counties do not provide any information to help the Court understand the profits they fear losing, and make it impossible for the Court to conclude that they will face "extreme hardship" analogous to the "destruction" of a private-sector business. *Air Transp. Ass'n*, 840 F. Supp. 2d at 336.

The Counties suggest that the loss of this revenue "may" have broader implications, Mot. 11-12, but their affidavits fall far short of establishing that such consequences are "*likely*," *Winter*, 555 U.S. at 22, as opposed to speculative. The Counties must do more than assert "a mere possibility that harm will come to pass," *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011); they must "present[] specific details" to show that such harm is *likely*, *Air Transp. Ass'n*, 840 F. Supp. at 336. The Counties' only attempts to meet this standard are their

11

affiants' "estimate[s]" that they will need to lay off employees if the agreements are terminated. Prim Aff. ¶ 6; Downey Aff. ¶ 6. But the Counties fail to substantiate these estimated losses. They do not explain, for instance, why these officers could not be redeployed on other assignments, including, for example, overseeing other categories of federal detainees. And even if job positions had to be removed, absent a "genuinely extraordinary situation," employment termination does not constitute irreparable harm. *Sampson*, 415 U.S. at 92 & n.68; *Bedrossian*, 409 F.3d at 845. The Counties cannot rely on their "estimate[s]" of job losses to show irreparable injury here.

The Counties suggest that the termination of their employees and other possible consequences could not be remedied after a judgment in their favor because, once ICE "re-locate[s] its detainees to other states," it is "unlikely" that they would make arrangements to house new detainees with them; "there is certainly no guarantee," they add, "that ICE would do so." Mot. 11. But the Counties' argument fails on multiple levels. For one, it is *the Counties'* burden to show that it is "*likely*," *Winter*, 555 U.S. at 22, that they will face irreparable injury; simply asserting that there is "no guarantee" that irreparable injury will *not* occur is not sufficient. In any event, the Counties' speculation that they would be unable to house ICE detainees again even if a judgment were ultimately entered in their favor is just that—speculation. Civil immigration detainees remain in the Counties' facilities for an average of only 60 days, *see* U.S. Imm. & Customs Enforcement, *Detention FY 2021 YTD* (Oct. 7, 2021),[4] so the Counties err in suggesting that the relevant question is whether ICE would move the specific individuals currently detained by the Counties elsewhere, Mot. 11. The relevant question is instead whether, if judgment were ultimately entered for the Counties, ICE would move *new* detainees to their facilities. The Counties identify no reason to believe ICE would not do so.

---

[4] https://www.ice.gov/doclib/detention/FY21_detentionStats10072021.xlsx.

12

The Counties' irreparable-injury argument also fails to account for another possibility: that they will continue exercising their contracts with the federal government to house *other* federal detainees. The Counties' contracts with the Marshals Service need not be "terminate[d]" in full, Mot. 11; the Act simply precludes the use of those contracts for the detention of "individuals for civil immigration violations," 5 ILCS 805/15(g)(2). The Counties' contracts expressly permit them to house other federal detainees, ECF 7-1 at 3, 19; indeed, Kankakee County housed non-immigrant detainees for *over a decade* before it began housing civil immigration detainees in 2016, Downey Aff. ¶ 2. The Counties identify no reason they cannot continue (or resume) that practice. Indeed, a New Jersey county that recently decided to stop housing civil immigration detainees made just this decision.[5] The Counties identify no reason they could not simply abide by the plain terms of their contracts to mitigate any financial losses.

### III. The equities tip decidedly against injunctive relief.

If the Court reaches the "balancing phase," *Ill. Republican Party*, 973 F.3d at 763, it should still not issue a preliminary injunction. At this stage, the Court considers "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied," and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818. Here, the Counties are unlikely to succeed on the merits,

---

[5] *See* Steve Janoski, *Bergen County Commissioners Unanimously Vote To End ICE Contract At County Jail* (Oct. 6, 2021), NorthJersey.com, https://www.northjersey.com/story/news/bergen/2021/10/06/bergen-county-nj-ice-jail-contract-expected-end-wednesday-night/6023534001/.

*supra* pp. 3-8, and so the burden on the State is minimal and easily met. In any event, these equitable factors tip decidedly in the State's favor: The Counties' estimated loss of profits cannot outweigh the State's interests in enforcing its duly enacted statutes and exercising its right not to participate in federal programs.

The State's interests are significant. The Way Forward Act was enacted to "expand[] protections for immigrant and refugee communities."[6] It does so in significant part by "requir[ing] local officials to end partnerships with ICE," *id.*, including in the area of immigration detention. Indeed, a wide range of studies have shown that state residents' fears of federal immigration enforcement efforts have a substantial effect on the State's ability to provide essential services. One recent study found that over 40% of Latinx parents surveyed—including those with lawful status—told their children to avoid police, medical care, and other public services. Roche et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, 62 J. Adolescent Health 525 (2018). The Act—including section 15(g)—was enacted to increase the trust these communities place in the State. Enjoining it would delay and frustrate that purpose, and erode trust between the State and many of its residents.

Regardless of the Act's objectives, enjoining section 15(g) would inflict significant sovereign injury. As the Supreme Court has explained, "the inability to enforce its duly enacted [statutes] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *accord, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined . . . from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Those interests are particularly weighty here

---

[6] Press Release, *Gov. Pritzker Signs Legislation Further Establishing Illinois as the Most Welcoming State in the Nation*, Aug. 2, 2021, https://www.illinois.gov/news/press-release.23653.html.

14

because section 15(g) reflects the State's exercise of its constitutional right to operate independently of the federal government. The State no longer wishes to assist the federal government in housing civil immigration detainees—a decision the Constitution entitles it to make. *See Printz*, 521 U.S. at 935. "State sovereignty" is among the most fundamental of the Constitution's protections; it "is not just an end in itself," but a guarantee that "secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. 211, 221 (2011). Enjoining section 15(g) would require the State to continue to participate in a federal program it has decided to exit, in contravention of the Tenth Amendment. That alone warrants denial of the motion.

The Counties' only response is to emphasize (again) the loss in profits they will incur upon implementation of the Act, Mot. 13, but they identify no case in which a court has enjoined a state statute based solely on estimated financial losses. Because the Counties' motion ultimately turns on their assertions of economic injury, they are not entitled to the "extraordinary remedy," *Winter*, 555 U.S. at 22, of injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for a preliminary injunction.

Dated: October 18, 2021

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

By: */s/ Alex Hemmer*
Christopher G. Wells
Kathryn Hunt Muse
Alex Hemmer
Eileen Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3000
alex.hemmer@ilag.gov

15