# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, bodies politic and corporate, | |
| *Plaintiffs,* | Case No. 21-cv-50341 |
| v. | Judge Philip G. Reinhard |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | Magistrate Judge Lisa A. Jensen |
| *Defendant.* | |

## AMICUS BRIEF IN SUPPORT OF DEFENDANT ILLINOIS ATTORNEY GENERAL

**Amici Statement of Interest**

*Amici curiae* respectfully submit this brief in support of the Illinois Attorney General. *Amici* include immigrant rights advocacy, legal, and volunteer organizations who litigate, organize, and advocate on behalf of Illinois immigrants and communities who stand to benefit from the legislation being challenged in this case. *Amici* have a substantial, shared interest in the Court's decision regarding whether to issue a preliminary injunction against enforcement of a portion of the Illinois Way Forward Act—legislation *Amici* advocated for and supported. *Amici* collectively have spent years advocating for termination of county detention contracts with ICE to protect immigrants in the state from the trauma and loss of livelihood resulting from detention and deportation. In light of this work, *Amici* are well-positioned to detail the harms to immigrant communities of continued detention contracts, to offer accurate information on Plaintiffs' obligations to detained individuals under their contracts with Immigration Customs Enforcement (ICE), and describe with accuracy the process that occurs at the time of contract termination.

**Summary of Argument**

The Illinois Way Forward Act takes tangible steps to scale back the trauma and economic loss imposed on Illinois immigrant communities due to detention and deportation, including through termination of county contracts with ICE for detention. A preliminary injunction would reward Plaintiffs for using federal taxpayer dollars intended for care of people in detention as profit to benefit other aspects of county governance, while individuals detained in Kankakee and McHenry counties continue to suffer from inhumane conditions and neglectful medical care. Plaintiffs' arguments rest on the faulty assumption that closures will result in automatic transfer of those detained to other ICE facilities, when in fact a facility closure offers an opportunity for individuals detained to ask ICE to exercise its broad authority to consider release rather than

2

transfer. An injunction would preclude this opportunity. These real and human harms compared to Plaintiffs' plainly stated profit motive weigh heavily against an injunction. In this brief, *Amici* shed light on Plaintiffs' improper use of federal dollars that form the basis of its allegations of harm, correct Plaintiffs' assumptions regarding the contract termination process with ICE, and describe the benefits and relief offered to all Illinois communities under the Illinois Way Forward Act.

## Argument

### I. Plaintiffs' Alleged Harm of Lost County Revenue is Based on Improper Use of Federal Dollars Intended for Care of Individuals in Federal Immigration Custody under the Contract

Despite clear statutory and contractual language requiring Plaintiffs to use federal dollars received through their contracts with U.S. Marshal Service ("USMS") and ICE[1] exclusively for the care of individuals in federal custody housed in their facilities, Plaintiffs plainly admit to using these federal funds on "many aspects of county government."[2] Plaintiffs additionally allege—without any corroborating evidence—that termination of contracts will result in significant county layoffs.[3] Plaintiffs' alleged harms are based on improper use of federal dollars and gratuitous profiting off the detention of immigrants as evidenced by the deleterious conditions in their county jails and should not be considered by this court.

---

[1] Plaintiffs contract with the U.S. Marshal Service (USMS) through an Intergovernmental Service Agreement (IGSA). ICE is a party to this existing contract through a provision known as a "rider" which uses federal dollars in the contract specifically to detain people for ICE in McHenry County Jail and the Jerome Combs Detention Center in Kankakee County. The Illinois Way Forward Act only requires the Plaintiffs to terminate the ICE riders on the IGSAs, while continuing to permit the use of the IGSAs to house individuals in USMS custody.
[2] ECF No. 10-1, Downey Aff., ¶ 4, Prim Aff., ¶ 4.
[3] ECF No. 10, PI Brief at 11; ECF No. 10-1, Downey Aff., ¶¶ 5-6, Prim Aff., ¶¶ 5-6; Exh. A, Fleming Decl., ¶¶ 8, 13-14.

### A. ICE payments are intended for the care and security of individuals in federal immigration custody under the contract, not to fund broad county government services

When Congress authorized ICE to allocate funds appropriated for federal civil immigration detainees to be housed in state or local detention facilities, it was explicit that those funds go toward <u>care</u> of those in detention. Specifically, under 8 U.S.C. § 1103(a)(11)(A), Congress legislated that such federal money be used: "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained."[4]

In light of this mandate, the contracts between Plaintiffs and ICE, through the rider on the USMS contract, define the services arising from the contract also explicitly in terms related to the care of individuals in federal custody. Both contracts state: "This agreement is for the housing, safekeeping, and subsistence of federal detainees in accordance with content set forth herein."[5] The contracts make clear that money allocated to Plaintiffs is to cover costs of medical, dental, and mental health care including the cost of medical supplies, over-the-counter medications and any prescription medications for those in federal custody.[6]

To further ensure that the funding granted to Plaintiffs is used toward care of individuals in detention, both contracts also allocate money on a per diem basis—attaching a dollar amount to each federally detained individual in Plaintiffs' care. By terms of the contract, each month Plaintiffs request the appropriate amount of federal funds by sending an invoice to ICE with the number of ICE detainees held in the county jail multiplied by the per diem amount agreed to in

---

[4] Throughout their complaint and motion for preliminary injunction, Plaintiffs erroneously cite to 18 U.S.C. § 4013 and 8 U.S.C. § 1231(g) as the statutory authority that authorizes ICE's rider on the USMS's IGSA. ECF 7, at ¶¶ 7, 10; ECF 10, at ¶¶ 1-2. That is incorrect. ICE authority to contract for detention services with a state or local governmental entity flows from 8 U.S.C. § 1103(a)(11)(A).
[5] ECF 7-1, Kankakee Contract at 1; ECF 7-1, McHenry Contract at 1.
[6] *Id.* at 4-5.

their contracts.[7] In other words, the number of those detained and the estimated cost of their individual needs determine the exact amount of federal taxpayer dollars Plaintiffs receive under their contracts.

Yet, Sheriffs Bill Prim and Michael Downey emphasize through their affidavits that Plaintiffs depend on the federal taxpayer dollars they receive for expenses far beyond the care of the individuals in their custody. The $41 million generated by the detention of 240 individuals per day is so critical to funding various aspects of McHenry county government that without it, "the county will need to increase the amount of tax collected to offset the loss or make budgetary cuts."[8] In Kankakee County, the loss of the nearly $16 million generated by the detention of 122 individuals will likely lead to "budgetary cuts."[9] But if Plaintiffs were using ICE funds appropriately as required by their contracts, they would not need to increase taxes or make "organizational changes which may not be easily re-dressed" as a result of termination.[10]

Troubling data recently received from McHenry County in response to FOIA requests related to the Sheriffs' affidavits in support of Plaintiff's motion for a preliminary injunction reveal that in fact the County profits significantly off its contract with ICE.[11] The County spends anywhere from $25.55 to $52.42 per day in costs related to the custody and care of federal ICE detainees, but receives a per diem of $95 for each federal detainee.[12] This gives the county a

---

[7] *See, e.g.*, "McHenry Jail Revenue Charts," National Immigrant Justice Center, *available at* https://www.documentcloud.org/documents/6795428-Jail-Revenue-Chart-Through-Mar-19.
[8] ECF 10-1, Prim Aff., ¶ 5.
[9] ECF 10-1, Downey Aff., ¶ 5.
[10] ECF 10, PI Brief at 11.
[11] Exh. A, Declaration of Mark Fleming, ¶¶ 6, 9-12. Despite submitting a sworn affidavit from Kankakee Sherriff Downey in support of the present motion, in response to a state FOIA request, the Kankakee County Sheriff's Office has not been able to provide the records that the Sheriff relied up for his affidavit. *Id.* at ¶¶ 7-8.
[12] *Id.* at ¶¶ 10-11.

profit margin of 45% to 73%.[13] The significant excess amount of federal dollars the county does not spend on care of those in detention is likley used to improperly subsidize other government services it references in its briefing.

### B. Deleterious conditions at McHenry County Jail and the Jerome Combs Detention Center in Kankakee County underscore Plaintiffs' failure to use federal dollars for adequate care of individuals in detention

Despite receiving $90-$95 per day intended for care and services to people in federal detention, Plaintiffs historically have failed to provide for detained individuals' most basic needs. The correctional facilities housing those in federal immigration detention in both McHenry and Kankakee counties demonstrate a failure to comply even with ICE's least protective detention standards, especially when it comes to medical services.[14]

Kankakee's Jerome Combs Detention Center: A 2019 survey and analysis of data from legal service providers documented that detained individuals in this facility reported going *over three months* without running water in their sinks, and no hot water in the showers.[15] The data further demonstrated a pattern of failure to timely respond to requests for medical attention or provide necessary medications.[16] Just this year, NIJC obtained grievance forms from the facility that illustrate a plethora of similar issues related to the lack of basic hygiene at the facility, and an

---

[13] *Id.* at ¶ 12.
[14] U.S. Immigration and Customs Enforcement, 2000 National Standards for Non-Dedicated Facilities, https://www.ice.gov/detain/detention-management/2000; U.S. Immigration and Customs Enforcement, Office of Detention Oversight, "Compliance Inspection, McHenry County Correctional Facility (Aug. 2020)," https://www.ice.gov/doclib/foia/odo-compliance-inspections/mcHenryCoCorrFacWoodstockIL_Aug_10-13_2020.pdf ("August 2020 McHenry Inspection"); National Immigrant Justice Center, "Detention Conditions Primer at Jerome Combs Detention Center (Kankakee)," https://www.documentcloud.org/documents/21082091-kankakee-primer ("NIJC Kankakee Primer").
[15] *Id.*
[16] *Id.*

inspection report showing that Kankakee was deficient in its suicide prevention program and related medical services.[17]

U.S. House Representative Jesus "Chuy" Garcia and other Chicago-area elected officials conducted a surprise visit to Kankakee in 2019 and corroborated these findings.[18] In a public statement. Rep. Garcia commented that the people there "lack access to basic needs every human deserves regardless of citizenship."[19]

McHenry County Jail:  Similarly, records related to McHenry County Jail's response to the COVID-19 pandemic showed the facility failed to provide even basic hygienic supplies and required people to pay for personal protective equipment out of their commissary accounts, an option that many could not afford.[20]  Prior to COVID-19 in 2019, the jail's failure to adopt the most basic public health protections resulted in a mumps outbreak among people in ICE custody.[21] Around this same time, a man detained in the jail died from a brain bleed related to alcohol withdrawal even though the staff was on notice of his history of alcohol consumption. Jail medical staff neglected to monitor him appropriately, and waited seven hours to transport

---

[17] "Kankakee Responsive FOIA Records Grievances," National Immigrant Justice Center, *available at* https://embed.documentcloud.org/documents/21080425-kankakee-responsive-foia-records-grievances.
[18] Carlos Ballesteros, "Politicians Condemn Conditions at ICE Detention Center in Kankakee," Chicago Sun Times (Oct. 10, 201), https://chicago.suntimes.com/2019/10/10/20908026/ice-detention-center-kankakee-jesus-chuy-garcia-chicago-immigration-deportation.
[19] *Id.*
[20] "FOIA Response Records McHenry Sheriff," National Immigrant Justice Center, *available at* https://www.documentcloud.org/documents/7048833-FOIA-Response-Records-McHenry-Sheriff.html.
[21] Clifford Ward, "McHenry County reports six cases of mumps among detainees in county jail this summer," Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/news/breaking/ct-mchenry-county-jail-mumps-outbreak-20190912-zy4crmelmnbxre7tvcixw22j44-story.html.

him to the hospital after he demonstrated withdrawal symptoms.[22] In 2018, 21 people detained in the facility launched a hunger strike in response to insufficient food options and mistreatment by guards.[23] In August 2020, the jail failed its ICE-ERO Office of Detention Oversight Inspection, which recorded 12 deficiencies spanning a broad range of violations of key detention conditions standards.[24]

The plaintiffs' abdication of their legal and ethical responsibilities to the people they detain on behalf of ICE pursuant to these contracts is best demonstrated through the harm that they have caused to community members. At a McHenry County Board Meeting on May 18, 2021, Kristin Glauner, the fiancé of Cesar Elizarraraz-Soto, a man detained at the McHenry facility gave testimony illustrating these harms.[25] Ms. Glauner stated:

> "The conditions inside this detention center here in McHenry County are inhumane. Detainees are not able to be out in the fresh air and get sunlight. They are not given medical care as needed as well. Instead, they need to put in a request to see or speak with a doctor or a psychiatrist, and then aren't seen for days or even weeks. My husband was diagnosed with high blood pressure while he has been detained. He was having major side effects due to the medication he was prescribed. He put in a request to see a doctor and to make the medical staff aware of the numbness and tingling in his hand. It was weeks before he was seen by a doctor….Our county should not be supporting these

---

[22] *See* Hamed Aleaziz, "A Mexican Immigrant in ICE Custody Died After Officials Waited More than Seven Hours to Transfer Him to a Hospital," BuzzFeed (Oct. 17, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/ice-custody-death-seven-hour-wait. ICE did not contradict these key facts in its official "Detainee Death Report." *See* U.S. Immigration and Customs Enforcement, "Detainee Death Report: Rodriguez-Espinoza, Roberto," *available at* https://www.ice.gov/doclib/foia/reports/ddrRodriguezEspinoza.pdf.
[23] *See* Mariah Woelfel, "Detainees Hold Hunger Strike at McHenry County Jail," WBEZ Chicago (Jan. 16, 2018), https://www.wbez.org/stories/detainees-hold-hunger-strike-at-mchenry-county-jail/d78cf5ad-768e-4acb-a3a1-c237a857fc9b; "Petition: 21 Hunter Strikers Demand Better Conditions at McHenry County Detention Center," Mijente, https://action.mijente.net/petitions/21-hunger-strikers-demand-better-conditions-at-mchenry-county-detention-center.
[24] *Supra* note 14, August 2020 McHenry Inspection.
[25] A recording of this meeting is on the McHenry County Meeting Portal, *available at* http://mchenrycountyil.iqm2.com/Citizens/SplitView.aspx?Mode=Video&MeetingID=5923&Format=Minutes. Ms. Glauner's entire testimony can be heard at 1:47:02–1:50:21.

practices and profiting off the misery of those that are being detained, or the family of those detained."[26]

Plaintiffs' misappropriation of ICE contract funds shows a willful disregard for the health and wellbeing of the vulnerable individuals they choose to detain in their counties.[27] The abhorrent conditions in both McHenry and Kankakee facilities and their great human cost reveal the disingenuousness of their alleged harm.

## II. ICE Maintains Broad Discretion to Review Cases for Possible Release When a Contract is Terminated, Rather Than Engaging in Automatic Transfers

Plaintiffs allege that termination of contracts will result in transfers of those currently detained to states and facilities far away—implying that remaining in ICE detention in their counties is a better option for those detained than inevitable transfer. Plaintiffs' argument rests on a number of false assumptions, and is plainly offensive in its claim to humanitarian concern for a population it seeks to continue jailing for profit. Plaintiffs entirely disregard the opportunity termination will present for individuals to ask ICE to consider exercising its broad discretion to release them to their communities for the duration of their immigration proceedings rather than keeping them detained. Just last month, ICE engaged in such a case-by-case review of individuals in immigration detention when Pulaski County terminated its contract with the agency, resulting in the release of 15 individuals.

---

[26] *Id.* at 1:48:10-1:49:41. *See also* Katie Smith, "Crystal Lake man faces deportation for second time," *Northwest Herald* (June 5, 2021), https://www.shawlocal.com/northwest-herald/news/local/2021/06/05/crystal-lake-man-faces-deportation-for-second-time/.

[27] *See also* U.S. Gov't Accountability Off., GAO-21-149, "Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts at 30 (Jan. 2021)," *available at* https://www.gao.gov/assets/gao-21-149.pdf (detailing how "ICE's supervisory structure does not provide sufficient independence for effective oversight of detention facility contracts and agreements").

### A. ICE retains prosecutorial discretion to make custody determinations and regularly exercises this discretion

When contracts between ICE and Plaintiffs are terminated pursuant to the Illinois Way Forward Act, ICE will have wide legal authority to utilize discretion to re-evaluate its basis for detention in the case of each individual currently detained and to consider release.

Congress grants ICE the authority to exercise its broad prosecutorial discretion to determine whether a person should be released from detention by assessing whether the individual poses a danger to the community or a flight risk.[28] The agency regularly exercises this prosecutorial discretion in making decisions regarding detention not only in consideration of individual cases, but also through agency-wide policies and practices. Various administrations have issued policies directing officers to release from detention or consider alternative forms of custody for individuals with medical conditions and other vulnerabilities including serious physical or mental illness, those with disabilities, individuals of older age, those who could demonstrate that they were primary caretakers, or those whose detention was generally not in the public interest.[29]

One high-level ICE official with the agency for 11 years confirms that the agency frequently releases individuals in immigration detention through prosecutorial discretion and details the agency's long line of directives to this end particularly for those with positive equities. He says: "Exercising prosecutorial discretion over detention was not only common, it was and

---

[28] *See Matter of Adeniji*, 22 I. & N. Dec. 1102 (BIA 1999).
[29] *See, e.g.*, ICE Enforcement and Removal Operations, "Directive 11071.1: Assessment and Accommodations for Detainees with Disabilities" (Dec. 15, 2016), at 9 (providing for release as an option for detainees with disabilities); Doris Meissner, "Exercising Prosecutorial Discretion," Immigration and Naturalization Services (Nov. 17, 2000), at 11 (citing "aliens with a serious health concern" as a trigger for the favorable exercise of discretion); *see also Franco-Gonzalez v. Holder*, 767 F. Supp. 2d 1034, 1061 (C.D. Cal. 2010) (providing for release of some individuals with severe mental illnesses).

continues to be an integral aspect of ICE's enforcement practices."[30] ICE is also subject at this time to a nationwide federal court order requiring that the agency identify all medically vulnerable persons in detention and consider them for release due to the COVID-19 pandemic.[31]

When contracts between Plaintiffs and ICE are terminated, the agency will have an opportunity to conduct an individualized custody review for each person detained, rather than immediately transfer. The agency's broad discretion to release, its history of agency-wide policies and practices of releasing certain groups of individuals, and the current order requiring release of vulnerable individuals will likely militate in favor of review and some releases rather than automatic transfers.

### B. ICE responded to Pulaski County's contract termination with a case review process that afforded individuals the opportunity to seek release to the community rather than transfer

ICE's response to the recent closure of the Pulaski County immigration detention facility in Ullin, Illinois further belies Plaintiffs' allegation that contract terminations with ICE will result in immediate transfers.

In August 2021, Pulaski County declared its intent to terminate its contract to detain individuals for ICE.[32] Within days of learning of the impending facility closure, 55 Illinois and national organizations delivered a letter to the ICE urging that it release the 50 individuals

---

[30] "Declaration of Andrew Lorenzen-Strait" at ¶ 14, *Dawson v. Asher*, 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), ECF No. 7, *available at* https://www.aclu.org/sites/default/files/field_document/7_declaration_of_andrew_lorenzen-strait.pdf- FINAL 2.docx.pdf (aclu.org).
[31] *Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 751 (C.D. Cal. 2020), order clarified, No. EDCV191546JGBSHKX, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).
[32] "Activists call for release of detainees as Pulaski County Detention Center ends ICE contract," The Southern (Sept. 30, 2021), https://thesouthern.com/news/local/activists-call-for-release-of-detainees-as-pulaski-county-detention-center-ends-ice-contract/article_a21e55ae-ad28-5b6f-98b3-1fa9d5346d50.html; *see also* Exh. B, Declaration of Ruben Loyo ¶¶ 8-10.

11

detained in that facility rather than transfer them.[33] Signatories pointed to the robust network of Chicago and Illinois-based non-profit organizations prepared to provide housing, legal services, and social services to immigrants should ICE exercise its discretion to release them to the community during their immigration court proceedings.[34]

Within days of the news breaking of the Pulaski closure, ICE scheduled a series of engagement sessions at the request of community organizations and initiated a process wherein those detained could submit evidence in support of a request to be released rather than transferred out of the Pulaski jail.

Throughout August, individuals detained at Pulaski submitted requests to be released rather than transferred, along with supplemental evidence in many cases demonstrating positive equities and plans for post-release support services.[35] In early September, the agency began notifying individuals regarding its decisions on release requests.[36] By late September, ICE had completed its reviews and of the approximately 50 individuals who were detained at Pulaski when the closure was announced, 15 were ultimately released by ICE to their communities.[37]

The Pulaski closure offered community members and organizations an opportunity to advocate for release on behalf of those detained, and it provided those in detention a chance to submit evidence in support of their release. The agency did not automatically transfer those detained, but instead conducted individual case reviews to consider release. Communities and NGOs around the country continue to advocate for just closures of immigration detention

---

[33] *See* "Request for urgent release of people in ICE custody – Pulaski County Jail, Illinois," August 26, 2021, *available at* https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2021-08/Pulaski-termination_56-Illinois-NGO-letter_release_2021-08-16.pdf.
[34] *Id.*
[35] Exh. B, Declaration of Ruben Loyo ¶¶ 8-10.
[36] *Id.*
[37] *Id.* at ¶11.

facilities, including a robust exercise of agency prosecutorial discretion in favor of safe releases rather than transfers.[38] Termination of contracts with ICE mandated under Illinois Way Forward will offer individuals detained in the state a similar meaningful opportunity to advocate with ICE for release.

### C. Legal service providers stand ready to continue representation of any individuals who are transferred by ICE to out-of-state facilities

For any individuals who are transferred from facilities in McHenry and Kankakee counties to other states, local community organizations and national legal organizations including *Amici* are prepared to offer continued representation and support. For example, the National Immigrant Justice Center intends to continue its representation of those it currently represents in both facilities even if the agency chooses transfer over release in their cases—as it did in the instance of termination of the Pulaski County contract with ICE.[39] NIJC is experienced in representing clients remotely across long geographic distances in their immigration detention and removal proceedings.[40] This continued legal representation along with support from a large ecosystem of immigrants' rights organizations and community groups statewide will mitigate the harms of transfers initiated by ICE.

### III. Illinois Way Forward Act Provides Tangible & Immediate Protections to Immigrant Communities in Illinois

Plaintiffs dismiss the Illinois Way Forward Act's importance to the state of Illinois by mischaracterizing the legislation as a mere political statement and glossing over its substance,

---

[38] Bob Libal, "Communities Not Cages: A Just Transition From Detention Economies," Detention Watch Network (2021), https://www.detentionwatchnetwork.org/pressroom/releases/2021/new-report-outlines-vision-just-transition-immigration-detention-economies.
[39] Exh. B, Declaration of Ruben Loyo at ¶ 6
[40] Exh. B, Declaration of Ruben Loyo at ¶4.

which offers immediate and improved protection and safety to immigrants statewide, increases public safety for all, and administers effective implementation of existing laws.

First, the legislation provides relief and improved protections to marginalized and powerless immigrant victims of domestic violence seeking to benefit from legal protections offered under the law.[41] Second, it protects public safety of all Illinois residents by expanding limitations on local police from participating in federal civil immigration enforcement and gives the Attorney General authority to investigate law enforcement agencies that violate those limitations.[42] When local police work with ICE to funnel people into detention and deportation, families fear taking their children to school, seeking medical attention, attending court hearings, seeking basic public health services, or seeking police protection.[43] This fear and mistrust of public institutions undermines public safety for all as many research studies show.[44] Third, the legislation creates clearer guidelines for Illinois government agencies regarding their engagement with immigration agencies on immigration-related enforcement, which enables these agencies to effectuate laws efficiently and properly allocate their resources toward the responsibilities of each agency.[45]

Finally, by terminating county contracts with ICE for immigration detention Illinois Way Forward offers individuals in detention under these contracts the opportunity for release so that they can reunite with their families and pursue their immigration cases from their own

---

[41] Illinois Way Forward Act, S.B.667, 5 ILCS 825/10 https://www.ilga.gov/legislation/102/SB/PDF/10200SB0667enr.pdf.
[42] *Id.* at 5 ILCS 805/5, 5 ILCS 805/15, 5 ILCS 805/30.
[43] *See* "Disentangling Local Law Enforcement from Federal Immigration Enforcement," National Immigrant Justice Center, (January 2021), Immighttps://immigrantjustice.org/research-items/policy-brief-disentangling-local-law-enforcement-federal-immigration-enforcementrant Justice Center.
[44] *Id.*
[45] *Supra* note 42 at 5 ILCS 805/15.

communities with access to legal counsel. By relying on false assumption that all those currently detained will be transferred and focusing solely on the harms imposed by transfer, Plaintiffs further ignore the protection the legislation offers Illinois immigrants in the future from detention in these substandard county facilities.

## CONCLUSION

Granting a preliminary injunction will reward Plaintiffs' for profiting off the federal taxpayer at the expense of detained immigrants and deprive those currently in these facilities of benefits explicitly intended by the broad coalition of community, legislators, and the Governor who worked to pass the Illinois Way Forward Act. In light of the inaccurate assumptions made by Plaintiffs and their plainly stated profit motivations which undermine the legitimacy of the harms they allege, this Court should deny Plaintiffs' request for a preliminary injunction.

Dated: October 18, 2021

Respectfully submitted,

 s/   Mark Fleming
Mark Fleming
Nayna Gupta
Sarah Thompson
National Immigrant Justice Center
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 660-1370
Facsimile: (312) 660-1505
mfleming@heartlandalliance.org
ngupta@heartlandalliance.org
sthompson@heartlandalliance.org

*Counsel for Amici*