**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, | |
| Plaintiffs, | No. 21-cv-50341 |
| v. | Judge Philip G. Reinhard |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | Magistrate Judge Lisa A. Jensen |
| Defendant. | |

**THE ATTORNEY GENERAL'S REPLY
IN SUPPORT OF HIS MOTIONS TO DISMISS AND STRIKE**

Date: November 5, 2021

Christopher G. Wells
Kathryn Hunt Muse
Alex Hemmer
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3000

## INTRODUCTION

The Tenth Amendment is the constitutional provision that dictates the outcome of this case: The Way Forward Act, which effectuates the State of Illinois' (the "State") constitutionally-protected decision to decline participation in federal immigration detention, must be upheld. McHenry County and Kankakee County (the "Counties") challenge the Way Forward Act based on preemption and federal intergovernmental immunity. But the Counties' arguments lead to outcomes that would violate the Tenth Amendment. They must be rejected.

There are two questions this Court must answer to resolve the State's motion to dismiss: *First*, does the State have the right to choose whether to participate in federal civil immigration detention or not? *Second*, can the State make this choice for its subunits? The parties acknowledge that the answer to the first question is unequivocally yes: The Tenth Amendment guarantees the State the right to choose whether to participate in federal immigration detention.

The parties disagree about the answer to the second question. The Counties contend that snippets of federal statutes, which vest the U.S. Attorney General with authority to "arrange for appropriate places of detention" for federal civil immigration detainees, mean that a local government can contract with the federal government over the objection of the local government's creating state. 8 U.S.C. § 1231(g). This contention is wrong based on the federal statutes the Counties cite, the Tenth Amendment and the related anti-commandeering rule, and Illinois law.

The federal statutes the Counties identify come nowhere close to authorizing the federal government to bypass the State's authority over whether its subunits participate in federal immigration detention. Quite the opposite: Even the case law the Counties cite affirms that these statutes reflect the constitutional limitation on the federal government's ability to commandeer state resources for federal immigration enforcement. *See GEO Group, Inc. v. Newsom*, 15 F.4th

919, 933 (9th Cir. 2021). Similarly, the provision of the Illinois Constitution the Counties cite, Ill. Const. art. VII, § 10(a), recognizes the State's ability to limit "by law" the contracting authority the State has conferred on the Counties—which is exactly what the Way Forward Act does.

The Counties argue the Tenth Amendment is irrelevant because there is no commandeering taking place; rather, the State has merely opted out of participating in federal immigration detention, while the Counties have opted in. To give the Counties the choice to continue their immigrant detention programs in this case, however, is to negate the State's choice as reflected in the Way Forward Act. Negating the State's choice is precisely what the Tenth Amendment and anti-commandeering precedent forbids. The Counties' challenges to the Way Forward Act fail as a matter of law. The complaint should be dismissed.[1]

## ARGUMENT

## I.    The Counties' preemption claim should be dismissed.

As the State explained (Mem. 9-15), the Counties' preemption claim fails and should be dismissed on multiple grounds, including—most basically—that their position would tether the State to a federal program that it has determined to exit.[2] The Counties resist this premise, but their arguments rest on a basic misunderstanding of the relationship between the federal government, the states, and state subdivisions like counties.

---

[1] The Attorney General argued that the references in the Counties' complaint to section 30(b) of the Way Forward Act should be stricken under Rule 12(f). *See* ECF 22. The Counties now concede that they do not bring independent claims against section 30(b). ECF 33 at 1. Accordingly, in the event the Court does not dismiss the complaint in its entirety, at a minimum, the Court should grant the Attorney General's motion to strike references to section 30(b).

[2] References to "Mem." are to the Attorney General's memorandum in support of his motion to dismiss, ECF 24; references to "Opp." are to the Counties' opposition to the motion to dismiss, ECF 34; references to "PI Opp." are to the Attorney General's opposition to the Counties' motion for a preliminary injunction, ECF 25; and references to "PI Reply" are to the Counties' reply in support of that motion, ECF 31.

Fundamental principles of federalism protect the State's ability to decline to participate in federal programs. Congress may not "issue orders directly to the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018), and thus may not "require[] the States to enact or administer a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 926 (1997). These principles guarantee states the "critical alternative" of "declin[ing] to administer [a] federal program." *New York v. United States*, 505 U.S. 144, 176-77 (1992).

Importantly, federalism principles protect the State's right to make this decision, not the Counties'. As state subunits, the Counties lack independent sovereign authority: They are only "convenient agencies" created by the State "for exercising such of the governmental powers of *the State* as may be entrusted to them." *Wisc. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607 (1991) (emphasis added). The Counties are, in all instances—including contracting—governed by state law, *see* Ill. Const. art. VII, § 10(a) (counties may contract in a manner "not prohibited by law").

There is nothing unusual about a state determining both for itself and its political subdivisions that it will participate—or not—in a federal program. States frequently direct their subdivisions not to participate in federal programs. *See, e.g.*, *Nixon v. Mo. Mun. League*, 541 U.S. 125, 128-29 (2004) (state statute directing subdivisions not to issue telecommunications licenses); *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 179 (3d Cir. 2021) (state statute directing subdivisions not to participate in immigration enforcement); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019) (same), *cert. denied*, 141 S. Ct. 124 (2020). States also provide the opposite direction to their subdivisions. *See, e.g.*, *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 173 (5th Cir. 2018) (state statute directing subdivisions *to* participate in immigration enforcement). The Tenth Amendment protects the State's choice, no matter which way it chooses.

The Counties suggest that Tenth Amendment principles are inapplicable here because no federal statute "require[s] state and local governments to house federal detainees" (Opp. 2), but that misses the point. If the Counties are right that the Way Forward Act is preempted, then that means that in some federal statute Congress gave state subdivisions the authority to ignore their state's decision not to participate in federal immigration enforcement. That would be an incredible derogation of state sovereignty, and it would invert the ordinary balance of state and local authority. But none of the grab-bag of federal statutes cited by the Counties (Opp. 10-11) supports their radical interpretation.

The Counties emphasize (Opp. 11) that one statutory provision, 8 U.S.C. § 1103(a)(11)(B), refers specifically to "political subdivisions" as potential counter-parts in detention agreements with the federal government. But the Counties cannot seriously suggest that this provision—which authorizes the Attorney General to make agreements with state and local governments—surreptitiously exempts state subdivisions from state law. As the Supreme Court has explained, if Congress intends to alter "the structure of [state] government, and the character of those who exercise government authority," it must "make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation marks omitted); *see Nixon*, 541 U.S. at 140–41 (applying *Gregory* to a federal statute that, on one reading, would "interpos[e] federal authority between a State and its municipal subdivisions"); *El Cenizo*, 890 F.3d at 178 (applying *Gregory* to a different provision of federal immigration law and concluding that "federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement") (cleaned up). Section 1103(a)(11)(B) comes nowhere close to satisfying this exacting standard. Indeed, as the Ninth Circuit has explained, that provision does little more than "clarif[y] that the federal

government cannot commandeer state and local governments into serving federal functions." *GEO Group*, 15 F.4th at 933.

The Counties argue that the State fails to "cite any legal support" for its argument (Opp. 8), but they have it backwards. The State has: (1) explained how foundational cases like *New York* and *Printz* establish its right to decline to support a particular federal program (Mem. 9–12); (2) identified cases extending that principle to state subdivisions, *supra* p. 3; and (3) pointed to specific authorities that establish why the Counties' preemption claims cannot succeed (Mem. 12–15; PI Opp. 5–8). It is the Counties, by contrast, that identify essentially no support for their unprecedented claims.

Despite purporting to rely on both field- and obstacle-preemption theories (Am. Compl. ¶¶ 27-28), the Counties cite *no* implied-preemption cases of their own except a line of cases standing for the unremarkable proposition that the federal government has authority over where its own immigration detainees are housed (Opp. 10). As the State has explained, however (*see* PI Opp. 7), those opinions have no preemption holding at all and are therefore irrelevant. Meanwhile, the Counties do not respond to multiple points, including that: (1) courts apply a presumption against preemption, *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008) (Mem. 12); (2) the Counties have identified no relevant field occupied "so pervasive[ly]" by the federal government that it leaves no room for regulation by States, *Planned Parenthood of Ind. v. Comm'r of Ind. State. Dep't Health*, 699 F.3d 962, 984 (7th Cir. 2012) (Mem. 13); and (3) a State's choice "to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal," *California*, 921 F.3d at 890 (PI Opp. 8). The Counties' failure to rebut these basic points in any of their three briefs—or even to spell out the basic details of their preemption theory—is telling.

In lieu of authority on point, the Counties grasp onto the Ninth Circuit's recent opinion in *GEO Group*, 15 F.4th 919, but *GEO Group* in fact illustrates why the Counties' claims fail. The state statute challenged in that case, unlike section 15(g) of the Way Forward Act, regulated not the conduct of the State and its political subdivisions, but of private parties: the operators of private detention facilities that contracted with the federal government. *Id.* at 924–25. The Ninth Circuit made just that distinction in rejecting the state defendants' arguments, explaining that the federal statute at issue—8 U.S.C. § 1103(a)(11)(B)—was enacted by Congress "with federalism in mind," to "clarify that the federal government cannot commandeer state and local governments into serving federal functions." 15 F.4th at 933–34. Thus, unlike in the Ninth Circuit's prior decision in *California*, which found no preemption precisely because the state statute in question regulated only the state and its political subdivisions, *see* 921 F.3d at 890–91, the panel in *GEO Group* found the state statute preempted, 15 F.4th at 935.

Section 15(g) of the Way Forward Act is like the statute in *California*, not the statute in *GEO Group*: It does not regulate private parties, but simply enacts a state policy of non-participation in federal immigration detention. As in *California*, "[f]ederal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities," and section 15(g) "simply makes that choice for [Illinois] law enforcement agencies," 921 F.3d at 889—as the Tenth Amendment permits Illinois to do. Count II fails and should be dismissed.

## II. The Counties' intergovernmental immunity claim should be dismissed.

The Counties' response does nothing to address the foundational flaw in their intergovernmental immunity claim: The Counties identify no court that has ever applied federal intergovernmental immunity to a subunit of a state against its creating state. This Court has no basis to become the first.

**A.    The Illinois Constitution affirms the Counties' subordinate status to the State.**

Ironically, the Counties begin their attempt to explain their intergovernmental immunity claim by citing the Illinois Constitution. But the very provision they cite affirms their subordinate status under Illinois law.

The Counties quote a provision in the Illinois Constitution that gives them the authority to contract, including with the United States, while also acknowledging that this contracting authority must be exercised in a manner "not prohibited by law or by ordinance." (Opp. 3 (citing Ill. Const. art. VII, § 10(a)).) They further concede that the Way Forward Act is just such a "law," but assert, without citation, that it does not count because it allegedly violates the Supremacy Clause and "cannot have the desired effect to prohibit the [detention] agreements by law." (Opp. 4.)

The fact that the Counties must first turn to the Illinois Constitution to identify the scope of their authority affirms a central premise of the motion to dismiss: whatever authority the Counties possess flows from the State. While the Counties contest the validity of this particular "law," they cannot and do not deny the State's ultimate authority to impose limitations on their contracting authority by "law[s]" enacted by the General Assembly. Ill. Const. art. VII, § 10(a).

**B.    Federal law affirms the Counties' subordinate status to the State.**

The motion to dismiss demonstrated that, as with state law, federal law affirms the State's sovereignty over its subunits. (Mem. 6–7.) The Counties respond by citing *Gomillion v. Lightfoot*, 364 U.S. 339, 344 (1960), for the unremarkable proposition that a state can sometimes be sued in federal court for "manipulat[ing] . . . the affairs of its municipal corporations" in a way that violates a federal constitutional right. (Opp. 4–5.) The Counties fail to recognize, however, that the relevant right in this case belongs not to the Counties, but to the State.

The State acknowledges that in cases like *Gomillion*—a Civil Rights Era case involving legislative redrawing of municipal boundaries for the racially discriminatory purpose of depriving Black residents of Tuskegee, Alabama representation in local government—a state can be subject to suit for "circumventing" certain "federally protected right[s]," such as those secured by the Fifteenth Amendment. 364 U.S. at 347-48. The difference between *Gomillion* and this case, however, is that here the Counties' have no "federally protected right" to house federal civil immigration detainees. *Id.*

In fact, the State is the party that possesses a "federally protected right": the sovereign right, reflected in the Tenth Amendment, to decline participation in federal programs, including federal immigration detention. *See California*, 921 F.3d at 891 (holding that the federal government "could not *require*" the state's cooperation in immigration enforcement "without running afoul of the Tenth Amendment"). *Gomillion*'s limited qualification on the authority of states to control their subdivisions does not give the Counties the ability to bypass the State's sovereign, constitutionally-protected decision to take Illinois and its subdivisions out of the business of federal immigration detention. Indeed, it was four years after *Gomillion* when the Supreme Court reaffirmed in *Reynolds v. Sims*, 377 U.S. 533, 575 (1964), that counties "never were and never have been considered as sovereign entities" in our federalist system. The State's sovereign choice, not the Counties' preference, is what matters in this case.

## C. The Counties' attempt to refashion themselves as federal instrumentalities misapplies intergovernmental immunity and offends federalism.

The Counties claim that the Way Forward Act violates intergovernmental immunity both by regulating the federal government directly and by "discriminat[ing] against the Federal Government or those with whom it deals." (Opp. 5 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)).) Neither claim is true. The Way Forward Act regulates the scope of the

Counties' contracting authority, just as the Illinois Constitution allows. It imposes no direct regulation on the federal government. Setting a statewide policy to opt out of federal immigration detention is also not "discriminat[ing]" against the federal government because the State retains the right under the Tenth Amendment to decline to deal with the federal government in this way.

### 1. The Way Forward Act does not directly regulate the federal government.

The Counties argue that the Way Forward Act "directly regulates the federal government by prohibiting agreements to which the federal government is a party[.]" (Opp. 5.) This proves too much. If it were true that "prohibiting agreements to which the federal government is a party" violates intergovernmental immunity, then a state (or a municipality, for that matter) could not prohibit its law enforcement agencies from entering "287(g)" agreements[3] with the federal government. But that is not the law. In fact, states have free rein to categorically accept or reject these types of agreements.

In *El Cenizo*, the Fifth Circuit concluded that nothing in federal law "prevent[s] states from regulating *whether* their localities cooperate in immigration enforcement," and that 8 U.S.C. § 1357(g), the provision authorizing 287(g) agreements, "does not require cooperation at all." 890 F.3d at 178; *see also* 8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision to enter into an agreement with the Attorney General under this subsection."). Although considering a state law on the opposite end of the cooperation-non-cooperation spectrum, the Ninth Circuit in *California* reiterated the same principle. 921 F.3d at 887 (citing *El Cenizo*, 890 F.3d at 178). Neither *El Cenizo* nor *California* treated a state's

---

[3] "287(g)" agreements are named after Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), which permits the U.S. Attorney General to "enter into a written agreement with a State, or any political subdivision of a State," to deputize state and local officials to perform federal immigration enforcement.

decision to forego a certain category of agreements with the federal government as a direct regulation of the federal government that violates intergovernmental immunity. Instead, both cases rightly recognize that this choice is an example of a state regulating its own conduct, as is its sovereign prerogative.

By contrast, *GEO Group*, 15 F.4th 919, which the Counties again cite (Opp. 5–6), involved a state law that went well beyond a state regulating itself, its own subunits, and its own contractual arrangements. The California law at issue there "purposefully include[d]" the federal government within its scope, *id.* at 928, and specifically interceded in contractual arrangements between the federal government and private companies. Here, the State is not interjecting itself into the federal government's agreements with private contractors—it is deciding for itself whether it and its subunits will maintain immigration detention contracts with the federal government. That is not a direct regulation of the federal government.

### 2. The Way Forward Act does not discriminate against the federal government or its instrumentalities.

The State's right to choose whether to participate in federal immigration enforcement also undermines the Counties' theory as to how the Way Forward Act allegedly "discriminates" against the federal government.

The Counties note that the Illinois Intergovernmental Cooperation Act, 5 ILCS 220/5, permits contracts among "public agenc[ies]," *id.* 220/2(1), including agencies of a county, a municipality, the state, or the United States, to carry out governmental functions like detention. (Opp. 7.) But as with their approach to the Illinois Constitution, the Counties overlook that this statute contains an important caveat: such agreements are authorized "except where specifically and expressly prohibited by law." *Id.* 220/5; *see also id.* 220/3. Once again, the Way Forward Act

is a "law" that "specifically and expressly prohibit[s]" the type of immigration detention contracting the Counties wish to continue. *Id.* 220/5.

Ignoring this critical caveat, the Counties claim that the Way Forward Act is discriminatory because "in a situation of prison overcrowding, the state could enter into an intergovernmental agreement with a county to house state prisoners,"[4] but the Way Forward Act "prohibits the federal government from engaging in" the "same activity." (Opp. 7.) The Counties' theory once again proves too much.

As a factual matter, the Counties are simply wrong about what the Way Forward Act does, as they elsewhere admit: The Way Forward Act does not prohibit the Counties from continuing their detention agreements with the U.S. Marshals Service or the Bureau of Prisons. (Opp. 5.) The federal government remains free to contract with the State or with the Counties in the event its prisons become overcrowded. The Way Forward Act simply limits what categories of federal detainees the Counties can accept: criminal detainees and inmates, but not civil immigration detainees. There is no discrimination against the federal government.

The Counties also cite no precedent holding that once the State offers to contract with a subunit for one type of broadly-defined governmental function, it must also permit contracting with the federal government for a similar function. That cannot be the law, as both *El Cenizo* and *California* demonstrate. State and local law enforcement frequently enter intergovernmental

---

[4] Ironically, the sheriffs of both the Counties sued the State just last year to try to force the State to accept inmate transfers from their jails—the same jails where federal immigration detainees are being housed—while the State was limiting such transfers to facilitate social distancing and prevent increased risk of Covid-19 transmission in the State's prisons. *See Landers v. Pritzker*, 2020 IL App (4th) 200356-U. The Counties' contradictory approach between these cases—insisting in *Landers* that state detainees must leave their jails, but claiming here that the more profitable federal immigration detainees must be allowed to stay—demonstrates the tangible harm to the State if it is not allowed to decide how state and local detention facilities are used in Illinois.

agreements to collaborate in the enforcement of state law. But just because a state enters cooperative agreements with its local law enforcement agencies does not mean it must also do so with the federal government. As the *El Cenizo* court explained, the very federal statute that authorizes intergovernmental agreements between the federal government and states and localities for immigration enforcement "does not require cooperation at all." 890 F.3d at 178. Given that federal law preserves the State's choice regarding whether to enter into immigration enforcement agreements with the federal government, an irrelevant state statute and a factually erroneous hypothetical do not establish the type of "discrimination" prohibited by intergovernmental immunity.

## CONCLUSION

Federal law, as embodied in the Tenth Amendment, preserves the State's sovereign right to decline participation in federal immigration enforcement. As a result, the State's choice to remove itself and its subunits from the business of federal immigration detention does not violate intergovernmental immunity or the Supremacy Clause. The Counties' claims fail and should be dismissed.

Dated: November 5, 2021

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

By:  /s/ Christopher G. Wells
Christopher G. Wells
Kathryn Hunt Muse
Alex Hemmer
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3000
christopher.wells@ilag.gov

12