# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, | |
| Plaintiffs, | No. 21-cv-50341 |
| v. | Judge Philip G. Reinhard |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | Magistrate Judge Lisa A. Jensen |
| Defendant. | |

## THE ATTORNEY GENERAL'S SUPPLEMENTAL MEMORANDUM IN RESPONSE TO THE COURT'S NOVEMBER 17 ORDER

The Attorney General submits this supplemental memorandum to address the questions posed by the Court in its November 17, 2021 order. (ECF 38.)

1. The Court directed the parties to address:

    "The application of *Murphy v. NCAA*, 138 S. Ct. 1461 (2018) to this case, discussing both its application of the anticommandeering doctrine and its discussion of preemption ('Our cases have identified three different types of preemption, "conflict," "express," and "field," but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or restrictions that conflict with the federal law; and therefore, the federal law takes precedence and the state law is preempted.') *Id.* at 1480 (emphasis added). '[E]very form of preemption is based on a federal law that regulates the conduct of private actors, not the States.' *Id.* at 1481."

Both *Murphy*'s application of the anticommandeering doctrine and preemption analysis illustrate why the Counties' claims fail. *Murphy*'s holding that Congress cannot dictate what a state legislature can and cannot do undermines the Counties' interpretation of the federal statutes they cite. According to the Counties' interpretation, Congress has restricted the Illinois General

Assembly's ability to discontinue participation by local law enforcement in Illinois in federal immigration detention. This interpretation violates the anticommandeering holding in *Murphy* and should be rejected. Similarly, the Counties' preemption arguments fail based on *Murphy*'s holding that preemption occurs through conflicting federal and state statutes directed at private actors. None of the federal statutes cited by the Counties regulate private actors and therefore none of them meet *Murphy*'s preemption requirements.

Citing the anticommandeering doctrine, *Murphy* explained that the U.S. Constitution does not give Congress "the power to issue direct orders to the governments of the States." 138 S. Ct. at 1476. As a result, the federal government can neither "commandeer the legislative processes of the States by compelling them to enact and enforce a federal regulatory program," nor "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 1477 (citing *New York v. United States*, 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898 (1997)) (cleaned up). The question in *Murphy* was whether a federal statute prohibiting states from authorizing certain forms of sports gambling violated this basic principle, or whether, as the federal government argued, this principle was inapplicable because the law in question did not affirmatively command states to act. 138 S. Ct. at 1478. The Supreme Court rejected the federal government's proposed limitation on the anticommandeering rule, describing it as an "empty" distinction. *Id.* Because the federal statute "dictate[d] what a state legislature may and may not do," *id.*, the Court explained, it violated the anticommandeering principle.

This principle likewise requires rejection of the Counties' claims here. As the State has explained, *see* Mem. 9–11, PI Opp. 4–5, Reply 3–4, the basic premise of the Counties' claims is that Congress has somewhere given them—two state subdivisions—the authority to override the

Illinois General Assembly's decision regarding whether state subdivisions will participate in federal immigration enforcement. That argument is inconsistent with the anticommandeering principle, as the State has explained. Congress may not "dictate[] what a state legislature may and may not do," *Murphy*, 138 S. Ct. at 1478, but under the Counties' theory, that is just what Congress has done—it has allegedly given state subdivisions the ability to circumvent a state legislature's instruction to stop participation in a particular federal program. In *Murphy*'s terms, "[i]t is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from" enacting Section 15(g) of the Way Forward Act. *Id.* That cannot be right.[1]

*Murphy*'s preemption discussion likewise illustrates why the Counties' preemption claims fail. The federal government in *Murphy* attempted to defend the federal statute at issue there as a "valid preemption provision"—i.e., a statute that simply preempted state laws authorizing sports gambling. 138 S. Ct. at 1479. The Supreme Court rejected that argument, explaining that a federal statute could be understood to preempt conflicting state law only when it "regulates private actors," not state and local governments. *Id.* All forms of preemption, the Court explained, "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* at 1480. The federal statute at issue in *Murphy*, the Court held, had no preemptive force because it could not "be understood as a regulation of private actors": It did not "confer any federal rights on private actors interested in conducting sports gambling operations," nor did it "impose any federal restrictions on private

---

[1] At the very least, as the State has explained, Reply 4–5, Congress would have had to "make its intention unmistakably clear in the language of the statute" before upending the federal-state balance in this manner. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation marks omitted). None of the federal statutes the Counties identify contains any such clear statement.

3

actors" in the form of a federal prohibition on private conduct. *Id.* at 1481. The law thus could not be understood to preempt anything.

The same is true here. None of the federal statutes the Counties have cited—not 8 U.S.C. § 1103(a)(11)(B), nor 8 U.S.C. § 1231(g), nor any other—regulates the conduct of private actors. Section 1103(a)(11)(B) confers authority on "[t]he [U.S.] Attorney General." Section 1231(g) directs "[t]he [U.S.] Attorney General" to "arrange for appropriate places of detention for aliens detained pending removal." The same is true of the other statutes the Counties have occasionally cited as preempting Section 15(g), all of which—in the Counties' own words—simply "give[]" the federal government "power" to take certain action. MTD Opp. 10. None of these statutes, in *Murphy*'s terms, "confer[s] any federal rights on private actors" nor "impose[s] any federal restrictions on private actors." 138 S. Ct. at 1481. Accordingly, none have preemptive effect. The Counties' preemption claim can be dismissed on this basis alone.

The Third Circuit recently applied *Murphy* to reach just such a conclusion in *Ocean County Board of Commissioners v. Attorney General*, 8 F.4th 176 (3d Cir. 2021). At issue in *Ocean County* was the validity of a New Jersey directive prohibiting state officers from assisting federal immigration enforcement efforts. *Id.* at 178–79. Two counties sued to enjoin the directive, arguing that it was preempted by two federal statutes: 8 U.S.C. § 1373, which bars state "official[s] and entities from prohibit[ing] . . . any government entity or official" from sharing immigration information with federal officials; and 8 U.S.C. § 1644, which states that "no State or local government entity may be prohibited" from sharing such information with the federal government. *Id.* at 179. The Third Circuit held that, because both statutes "sa[id] nothing about private actors," they could not "be fairly read to regulate them," and so could not be understood as valid preemption provisions under *Murphy*. 8 F.4th at 182. "A federal statute that does not regulate private actors

4

cannot serve as a basis for preemption," that court explained, "so [the counties'] claims must fail." *Id.* The same is true here: Because none of the statutes identified by the Counties regulate private actors, they cannot have preemptive effect, and so the Counties' preemption claim fails.

2. The Court also directed the parties to address the following question:

> "Generally, where some Illinois local governments have entered contracts to provide a category of services, for example information technology services, to other entities, and those contracts allow either party to voluntarily terminate the contract, can the State of Illinois by statute require the service-providing local governments to exercise their contractual right to terminate those contracts by a certain date?"

Yes. The State may require by statute that one of its subunits exercise a contractual right to terminate a contract by a certain date.

Article VII, Section 10(a) of the Illinois Constitution recognizes the State's authority to impose limits "by law" on the contracting authority of its local governments. Ill. Const. art. VII, § 10(a). Likewise, the Illinois Intergovernmental Cooperation Act, 5 ILCS 220/5, recognizes the State's authority to impose limits "by law" on the ability of "public agencies" in Illinois, including local governments, to contract for the performance of governmental services. This constitutional and statutory authority encompasses the ability to require by statute that local governments terminate contracts by a certain date in furtherance of a statewide policy adopted by the General Assembly.

Section 15(g) of the Way Forward Act is consistent with prior statutes enacted by the General Assembly requiring local governments to terminate specific categories of contracts by a certain date. When the General Assembly enacted the Environmental Barriers Act in 1985, *see* P.A. 84-948 (eff. Sept. 25, 1985) (excerpted at Exhibit 1), it required all "governmental unit[s]" within Illinois—including counties, *id.* § 3—to "make all reasonable efforts" to "terminate" any

5

"lease, rental or use" for a building or structure that did not comply with the accessibility standards imposed by the statute by January 1, 1990:

> No governmental unit may enter into a new or renewal agreement to lease, rent or use, in whole or in part, any building, structure or improved area which does not comply with the standards. Any governmental unit which, on the effective date of this Act, is leasing, renting or using, in whole or in part, any building, structure or improved area which does not comply with the standards shall make all reasonable efforts to terminate such lease, rental or use by January 1, 1990.

*Id.* § 5. Similar to the Way Forward Act, the Environmental Barriers Act charged the Illinois Attorney General with enforcing its provisions. *Id.* § 6; *see, e.g.*, *Jafri ex rel. Illinois v. Chandler LLC*, 970 F. Supp. 2d 852, 862 (N.D. Ill. 2013) (recognizing the Attorney General's enforcement authority and denying motion to dismiss).

In 2016, when the General Assembly amended the Environmental Barriers Act to incorporate the Illinois Accessibility Code, 71 Ill. Adm. Code 400, the General Assembly again required "any governmental unit[s]" within Illinois—defined to include "local government units," such as counties—to "make all reasonable efforts to terminate" leases with buildings not in compliance with the Accessibility Code. P.A. 99-582, §§ 3, 5 (eff. Jan. 1, 2017). Unlike the original Environmental Barriers Act, however, the termination obligation took effect immediately upon the amendment's effective date. *Id.* § 5(c) (deleting prior termination deadline).

Section 15(g) of the Way Forward Act operates in a functionally equivalent manner. In fact, if anything, the Environmental Barriers Act and its 2016 amendment swept more broadly by requiring "all reasonable efforts" to terminate without regard to whether the affected local governments' leases were terminable at will. The Environmental Barriers Act required termination of building leases, which typically have a fixed term. If the General Assembly can require local governments to prematurely terminate fixed-term leases, then it also has the less-intrusive ability to require local governments to exercise termination provisions expressly provided for in their

6

contracts. Like the Environmental Barriers Act, Section 15(g) of the Way Forward Act reflects the General Assembly's authority to require local governments to exercise contractual termination rights to effectuate a statewide policy.

Contracts related to information technology services, like those the Court describes (ECF 38), would be no different. For example, if the General Assembly were to adopt statewide security standards for information stored on state and local government computer networks, it could require local governments to only enter contracts consistent with those standards and to terminate existing contracts that do not meet those standards by a certain date. That is what the General Assembly did to local governments' lease agreements when implementing statewide accessibility standards through the Environmental Barriers Act and its 2016 amendment. Similarly, by prohibiting local governments from entering future immigration detention agreements and requiring termination of existing detention agreements through Section 15(g) of the Way Forward Act, the General Assembly effectuated its statewide policy of non-participation in federal immigration enforcement.[2]

The Counties may not argue for the first time in response to the Court's question that the State cannot, as a matter of state law, require them by statute to exercise the termination provisions in their detention agreements. The Counties have waived any such argument by failing to raise it in their pleading or in their response to the State's motion to dismiss. *See Lekas v. Briley*, 405 F.3d 602, 614–15 (7th Cir. 2005) ("Our system of justice is adversarial and our judges are busy people.

---

[2] Even prior to the adoption of Section 15(g) and the Way Forward Act, the Counties' sheriffs and sheriffs' deputies were arguably in violation of Section 15(a) of the Illinois TRUST Act in performing their obligations under the detention agreements to the extent they were "detain[ing]" or "contin[uing] to detain" individuals in their jails "solely on the basis of any immigration detainer or non-judicial immigration warrant . . . ." P.A. 100-463, § 15(a) (eff. Aug. 28, 2017). Thus, even in the absence of Section 15(g), the Counties' continued performance of the detention agreements could still lead to violations of state law.

If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (quoting *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999)).

Furthermore, sovereign immunity precludes the Counties from obtaining injunctive relief in a federal forum based on such an argument. Any such argument would necessarily be predicated on state law[3]—specifically, whether Section 15(g) of the Way Forward Act is a valid exercise of the General Assembly's legislative authority. But in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), the Supreme Court held a federal court may not enjoin state officials for allegedly failing to follow state law. Citing "the principles of federalism that underlie the Eleventh Amendment," the Court said that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106. Here, *Pennhurst* precludes an injunction against the State for any alleged state law defect in Section 15(g) of the Way Forward Act. In any event, as discussed above, there is no such defect.

## CONCLUSION

For these reasons, and those set out in the Attorney General's prior briefing in support of his motion to dismiss, the Court should grant the Attorney General's motion to dismiss and deny the Counties' motion for a preliminary injunction.

---

[3] As the State has demonstrated, federal law does not prohibit the State from regulating whether its subunits will participate in federal immigration enforcement. *See City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement.") (citation omitted).

Dated: November 22, 2021

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

By: */s/*Christopher G. Wells
Christopher G. Wells
Kathryn Hunt Muse
Alex Hemmer
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3000
Christopher.wells@ilag.gov

# EXHIBIT 1

(s) "Public" means any group of people who are users of the building and employees of the building excluding those people who are employed by the owner of a building for construction or alteration of a building.

(t) "Owner" means the person contracting for the construction or alteration. Such person may be the owner of the real property or existing facility or may be a tenant of same.

(u) "Reproduction cost" means the estimated cost of constructing a new building, structure or improved area of like size, design and materials at the site of the original building, structure or improved area, assuming such site is clear. The reproduction cost shall be determined by using the recognized standards of an authoritative technical organization.

(v) "State" means the State of Illinois and any instrumentality or agency thereof.

Section 4. Standards. The Capital Development Board shall adopt and publish accessibility standards. Accessibility standards for public facilities shall dictate minimum design, construction and alteration requirements to facilitate access to and use of the public facility by environmentally limited persons. Accessibility standards for multi-story housing units shall dictate minimum design and construction requirements to facilitate access to and use of the common areas by environmentally limited persons and create a number of adaptable dwelling units in accordance with Section 5. With respect to areas within public facilities or multi-story housing units which areas are restricted to use by the employees of businesses or concerns occupying such restricted areas, the Capital Development Board shall promulgate standards designed to ensure that such areas will be accessible to those environmentally limited persons who can reasonably be expected to perform the duties of a job therein.

The standards shall be adopted and revised in accordance with The Illinois Administrative Procedure Act.

Section 5. Scope. The standards adopted by the Capital Development Board shall apply to:

(a) Any new public facility or portion thereof, the construction of which is begun after the effective date of this Act. However, any new public facility (1) for which a specific contract for the planning has been awarded prior to the effective date of this Act and (2) construction of which is begun within 12 months of the effective date of this Act shall be exempt from compliance with the standards adopted pursuant to this Act insofar as those standards vary from standards adopted pursuant to the Facilities for Handicapped Act.

(b) Any new multi-story housing unit or portion thereof, the construction of which is begun after the effective date of this Act.

---

**Changes or additions indicated by *italics* deletions by ~~strikeout~~.**

However, any new multi-story housing unit (1) for which a specific contract for the planning has been awarded prior to the effective date of this Act and (2) construction of which is begun within 12 months of the effective date of this Act shall be exempt from compliance with the standards. Provided, however, that if the common areas comply with the standards, if 20% of the dwelling units are adaptable and if the adaptable dwelling units include dwelling units of various sizes and locations within the multi-story housing unit, then the entire multi-story housing unit shall be deemed to comply with the standards.

(c) Any alteration to a public facility owned by the State; provided that:

(1) if the alteration costs 15% or less of the reproduction cost of the public facility, only the part being altered must comply with the standards;

(2) if the alteration costs more than 15% but less than 50% of the reproduction cost of the public facility, the following must comply with the standards: (i) the part being altered, (ii) a means of ingress and egress intended for use by the general public, and (iii) all areas necessary to provide a continuous and unobstructed interior route of travel between that means of ingress and egress and the part being altered;

(3) if the alteration costs 50% or more of the reproduction cost of the public facility, the entire public facility must comply with the standards.

(d) Any alteration to a public facility owned by any governmental unit other than the State, and any alteration to a privately-owned public facility, where the alteration costs more than 15% of the reproduction cost of the public facility; provided that:

(1) if the alteration costs more than 15% but less than 50% of the reproduction cost of the public facility, the following must comply with the standards: (i) the part being altered and (ii) a means of ingress and egress intended for use by the general public;

(2) if the alteration costs 50% or more of the reproduction cost of the public facility, the entire public facility must comply with the standards;

(3) compliance with the standards is not mandatory where the cost of the alteration is 15% or less of the reproduction cost of the public facility unless the cost of the alteration exceeds $100,000, in which case the part being altered must comply with the standards. For the purpose of calculating percentages of reproduction cost, the cost of alteration shall be construed as the total actual combined cost of all alterations made within any period of 30 months.

In no case shall any alteration of any public facility or multi-story housing unit create an environmental barrier or cause the

**Changes or additions indicated by** *italics* **deletions by** strikeout.

public facility or multi-story housing unit to be further from compliance with the standards than it was prior to the alteration.

No governmental unit may enter into a new or renewal agreement to lease, rent or use, in whole or in part, any building, structure or improved area which does not comply with the standards. Any governmental unit which, on the effective date of this Act, is leasing, renting or using, in whole or in part, any building, structure or improved area which does not comply with the standards shall make all reasonable efforts to terminate such lease, rental or use by January 1, 1990.

No public facility may be constructed or altered and no multi-story housing unit may be constructed without the statement of an architect registered in the State of Illinois that the plans for the work to be performed comply with the provisions of this Act and the standards promulgated hereunder unless the cost of such construction or alteration is less than $50,000. In the case of construction or alteration of an engineering nature, where the plans are prepared by an engineer, the statement may be made by a professional engineer registered in the State of Illinois or a structural engineer registered in the State of Illinois that the engineering plans comply with the provisions of this Act and the standards promulgated hereunder. The architect's and/or engineer's statement shall be filed by the architect or engineer and maintained in the office of the governmental unit responsible for the issuance of the building permit. In those governmental units which do not issue building permits, the statement shall be filed and maintained in the office of the county clerk.

Section 6. Civil Enforcement. (a) The Attorney General shall have authority to enforce the standards. The Attorney General shall investigate any complaint or reported violation of this Act and, where necessary to ensure compliance, may bring an action for any or all of the following:

(1) mandamus;
(2) injunction to halt construction or alteration of any public facility or to require compliance with the standards by any public facility which has been or is being constructed or altered in violation of this Act;
(3) injunction to halt construction of any multi-story housing unit or to require compliance with the standards by any multi-story housing unit which has been or is being constructed in violation of this Act; or
(4) other appropriate relief.

Section 7. Penalties. (a) Any owner constructing or altering a public facility or constructing a multi-story housing unit in violation of this Act shall be guilty of a business offense punishable by a fine not to exceed $1,000.

---

**Changes or additions indicated by *italics* deletions by ~~strikeout~~.**

(b) Any architect or engineer negligently or intentionally stating pursuant to Section 5 of this Act that a plan is in compliance with this Act when such plan is not in compliance shall be subject to a suspension, revocation or refusal of restoration of his or her certificate of registration pursuant to The Illinois Architecture Act, The Illinois Professional Engineering Act and The Illinois Structural Engineering Act.

(c) Any person issuing a building permit or other official authorization for the construction or alteration of a public facility or the construction of a multi-story housing unit in violation of this Act shall be guilty of a business offense punishable by a fine not to exceed $1,000.

(d) The executive director of the Capital Development Board or any other person may request the State's Attorney of the county in which the public facility or multi-story housing unit is located to initiate prosecution under this Section.

Section 8. Local Standards. The provisions of this Act and the regulations and standards promulgated hereunder constitute minimum requirements for all governmental units, including home rule units. Any governmental unit may prescribe more stringent requirements to increase and facilitate access to the built environment by environmentally limited persons.

Section 9. Section 13 of "The Illinois Architecture Act", approved June 24, 1919, as amended, is amended to read as follows:

(Ch. 111, par. 1218)

Sec. 13. The Department of Registration and Education may refuse to issue, to renew, may suspend or may revoke any certificate of registration for any one or any combination of the following causes:

(a) gross incompetency;
(b) recklessness in the performance of professional services as outlined in Section 2;
(c) violation of a rule or regulation of the Department governing professional conduct;
(d) conviction of the second violation of this Act;
(e) false or fraudulent representation in obtaining a certificate of registration as an architect;
(f) conviction in this or another State of any crime which is a felony under the laws of this State or conviction of a felony in a federal court, if the Department determines, after investigation, that such person has not been sufficiently rehabilitated to warrant the public trust;
(g) aiding another person to evade this Act;
(h) signing, affixing his seal or permitting his seal to be affixed to any plans, specifications or drawings not prepared by the architect himself or under his personal direction and supervision,

---

**Changes or additions indicated by *italics* deletions by strikeout.**