CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit



In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-3334

MCHENRY COUNTY and KANKAKEE COUNTY,

*Plaintiffs-Appellants*,

*v.*

KWAME RAOUL, in his official capacity
as Illinois Attorney General,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:21-cv-50341 — **Philip G. Reinhard**, *Judge*.

_____

ARGUED MAY 18, 2022 — DECIDED AUGUST 9, 2022

_____

Before HAMILTON, BRENNAN, and KIRSCH, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In our constitutional scheme, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). The States have "substantial sovereign authority" under this arrangement. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This case concerns the boundaries of that authority as

applied to municipalities and other political subdivisions created by State law.

In 2021, the State of Illinois passed a law prohibiting State agencies and political subdivisions from contracting with the federal government to house immigration detainees. Two Illinois counties challenge the law, arguing that it is preempted by federal immigration statutes and that it violates the doctrine of intergovernmental immunity. The district court rejected those arguments and granted the State's motion to dismiss for failure to state a claim. We affirm. The Illinois law is a permissible exercise of the State's broad authority over its political subdivisions within our system of dual sovereignty.

I.  *Factual and Procedural Background*

The plaintiffs' constitutional challenges invoke several federal statutes addressing immigration detention. One provides that the Attorney General of the United States "shall arrange for appropriate places of detention" for immigration detainees being held "pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). In carrying out this statutory duty, the Attorney General is authorized

> to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by [Immigration and Customs Enforcement (ICE)].

§ 1103(a)(11)(B). Also, before constructing any new detention facility, ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." § 1231(g)(2).

Plaintiffs McHenry County and Kankakee County are political subdivisions of Illinois. For years, both had agreements with the federal government to house persons detained by federal immigration authorities. The Counties agreed to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of Federal detainees." Those detainees included "individuals who are awaiting a hearing on their immigration status or deportation." Both agreements were terminable by either party for any reason with thirty days' notice. The Counties collected millions of dollars in revenue by providing detention services under these agreements.

In August 2021, the State passed the Illinois Way Forward Act. The Act amended an existing law prohibiting State and local officials from enforcing federal civil immigration law. As relevant here, the Act provides that neither law enforcement agencies and officials nor "any unit of State or local government may enter into or renew any contract … to house or detain individuals for federal civil immigration violations." 5 ILCS 805/15(g)(1). The Act also requires any entity with an existing contract to "exercise the termination provision in the agreement as applied to housing or detaining individuals for civil immigration violations no later than January 1, 2022." 805/15(g)(2).

The Counties filed a complaint in the Northern District of Illinois alleging that the Act is preempted by federal law and violates principles of intergovernmental immunity. The district court concluded that the Counties' preemption argument

failed at the outset because the federal statutes at issue did not regulate private conduct. *McHenry County v. Raoul*, No. 21 C 50341, — F. Supp. 3d —, 2021 WL 5769526, at \*5–6 (N.D. Ill. Dec. 6, 2021). And even under an analysis of field and conflict preemption, the court said, the Act was not invalid. *Id.* at \*6–7. The court also rejected the intergovernmental immunity argument, holding that the Act "does not directly regulate the federal government nor discriminate against the federal government or the plaintiffs." *Id.* at \*8. The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The court also denied the Counties' motion to enjoin enforcement of the Act pending appeal. *McHenry County v. Raoul*, No. 21 C 50341, 2021 WL 8344241, at \*1 (N.D. Ill. Dec. 27, 2021).

The Counties then asked this court for an emergency injunction or stay. We temporarily stayed enforcement of the Act against these plaintiffs, briefly extending the deadline for the Counties to exercise the termination provisions until January 13, 2022. After expedited briefing on the stay question, we denied any further stay, concluding on January 12, 2022 that the Counties had failed to show a strong likelihood of success on the merits and that none of the other stay factors weighed in their favor. *McHenry County v. Raoul*, No. 21-3334, 2022 WL 636643, at \*1 (7th Cir. Jan. 12, 2022).

On January 13, 2022, the Counties gave their thirty-day notice of termination to the federal government. Briefing and oral argument in this appeal followed. We now reject the preemption and intergovernmental immunity challenges and affirm the judgment of the district court.

No. 21-3334                                                    5

II.  *The Preemption Challenge*

First, the Counties argue that the Act is preempted by federal law. We review that legal question de novo, without deferring to the district court's decision. *Nelson v. Great Lakes Educational Loan Services, Inc.*, 928 F.3d 639, 642 (7th Cir. 2019).

Preemption doctrine stems from the Supremacy Clause: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land." U.S. Const. art. VI. The Supremacy Clause provides "'a rule of decision' for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020), quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015). In cases where federal and state law conflict, "federal law prevails and state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The federal government's advantage under the Supremacy Clause is "an extraordinary power in a federalist system," and it is "a power that we must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460.

The Supreme Court has recognized "three different types of preemption—'conflict,' 'express,' and 'field.'" *Murphy*, 138 S. Ct. at 1480. All three, however, "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* In analyzing a preemption claim, "the purpose of Congress is the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

The Counties argue that the Illinois Act is invalid under principles of field and conflict preemption. The State disagrees on both grounds and further asserts, relying on *Murphy v. NCAA*, that preemption cannot apply at all because the federal statutes at issue do not regulate private actors. While we begin with that argument, we ultimately need not resolve it. Instead, we conclude that the Counties' field and conflict preemption challenges both fail.[1]

A.  *Murphy v. NCAA*

The State's threshold preemption argument rests on the Supreme Court's decision in *Murphy*. There, a federal statute made it unlawful for any State or political subdivision to authorize sports gambling. After concluding that the statute violated the anticommandeering doctrine, the Court turned to the federal government's preemption argument. The Court announced a broad rule that a valid preemption provision "must be best read as one that regulates private actors." 138 S. Ct. at 1479. After providing some examples of preemption, the Court reiterated that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 1481. The provision at issue, however, neither conferred any federal rights nor imposed any federal restrictions on private actors. It could be understood only as "a direct command to the States." *Id.* As a result, the federal government's preemption argument failed.

Relying on *Murphy*, the district court here rejected the Counties' preemption argument because 8 U.S.C. § 1103(a)(11)(B), which authorizes the Attorney General to

---

[1] The Counties sued Attorney General Raoul in his official capacity. We refer to him as the State throughout this opinion.

No. 21-3334                                                    7

enter into cooperative agreements for detention facilities, does not regulate private actors. *McHenry County*, 2021 WL 5769526, at *5–6. The State makes a similar argument on appeal, asserting that "only federal laws that regulate private actors can be understood to preempt state law, and plaintiffs' cited statutes do not regulate private conduct."

The Counties apparently concede that § 1103(a)(11)(B) and § 1231(g), which instructs the Attorney General to "arrange for appropriate places of detention," do not regulate private actors. The Counties argue, however, that *Murphy*'s private-actor requirement is in tension with *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985). The federal statute at issue there compensated local governments for costs related to tax-immune federal lands within their jurisdictions. But a South Dakota law required the local governments to allocate those federal funds in the same way they allocated general tax revenues. The Court concluded that the federal statute, which allowed localities to use the funds for any governmental purpose, preempted the state law. The Counties assert that the case conflicts with *Murphy* because the federal statute preempted in Lawrence County did not regulate private actors.[2]

We take the Counties' point, but we are reluctant to endorse their argument that *Murphy* did not really mean what it

---

[2] The State, for its part, offers a distinction to resolve any potential tension between the cases: *Lawrence County*—unlike both *Murphy* and this case—involved Spending Clause litigation. The Court concluded that the federal government had "merely imposed a condition on its disbursement of federal funds," which was not an impermissible intrusion into South Dakota's fiscal affairs. *Lawrence County*, 469 U.S. at 269. We need not decide here whether that proposed distinction is persuasive.

said about preemption. Cf. *Mathis v. United States*, 579 U.S. 500, 514 (2016) (explaining that "a good rule of thumb for reading our decisions is that what they say and what they mean are one and the same"). The Court said at least three times in *Murphy* that a valid preemption provision is one that regulates private actors. See 138 S. Ct. at 1479, 1480, 1481. Other courts have relied on *Murphy* to reject preemption claims where the federal immigration statutes at issue did not regulate private actors. See, e.g., *Ocean County Board of Comm'rs v. Attorney General of New Jersey*, 8 F.4th 176, 181–82 (3d Cir. 2021) (relying on *Murphy* to reject preemption claim because a "federal statute that does not regulate private actors cannot serve as a basis for preemption"); *Colorado v. United States Dep't of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) (similar).

In the end, however, we need not map the precise limits of *Murphy*'s preemption holding. Even setting aside the threshold argument that 8 U.S.C. § 1103(a)(11)(B) and § 1231(g) do not regulate private actors, we agree with the district court that the Counties' field and conflict preemption challenges fail. Since the parties briefed those issues in the district court and on appeal, we can and will affirm on those grounds. See *Regains v. City of Chicago*, 918 F.3d 529, 533 (7th Cir. 2019) ("We may affirm on any ground that the record supports, as long as the district court adequately addressed that ground and the non-moving party had the opportunity to contest it.").

## B. *Field Preemption*

The Counties argue that the Act is invalid as a matter of field preemption. States may not regulate conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."

No. 21-3334                                                    9

*Arizona v. United States*, 567 U.S. 387, 399 (2012). Accordingly, State law is preempted "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 138 S. Ct. at 1480, quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986). We have said that field preemption is "rare" and is "confined to only a few areas of the law." *Nelson*, 928 F.3d at 651–52 (citing National Labor Relations Act and Employee Retirement Income Security Act as examples). The statutory grounds for rare field preemption simply are not present here.

The federal government "has broad, undoubted power over the subject of immigration." *Arizona*, 567 U.S. at 394. That authority derives from its "constitutional power to 'establish an uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394–95. At the same time, the "pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397.

The Counties assert that the federal government has occupied the field of detaining and housing noncitizens, thereby preempting State regulation. That argument, however, finds no support in the text of the federal statutes on which the Counties rely. By its terms, 8 U.S.C. § 1103(a)(11)(B) authorizes the Attorney General "to enter into a *cooperative agreement* with any State, territory, or political subdivision thereof." (Emphasis added.) An "agreement" is of course an arrangement to which both parties have consented. Section 1103(a)(11)(B) thus contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not. It simply does not

10                                No. 21-3334

command that they do so. A provision that allows for policy decisions by States and localities as to the extent of their participation is about 180 degrees away from a command, let alone one that leaves "no room for supplementary state legislation." See *R.J. Reynolds Tobacco*, 479 U.S. at 140.

The Counties emphasize the use of the term "or" in the statutory language authorizing a cooperative agreement with any "State, territory, *or* political subdivision thereof." § 1103(a)(11)(B). According to the Counties, this language means that "the federal government intended the execution of the agreements with the counties to be independent from the state."

This argument loads far too much weight onto the word "or," particularly since this is national legislation that must be written to apply in every State, many of which leave this choice up to local governments. Unlike States, political subdivisions such as counties "never were and never have been considered as sovereign entities." *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 362 (2009), quoting *Reynolds v. Sims*, 377 U.S. 533, 575 (1964); see also Ill. Const. art. VII, § 7 ("Counties and municipalities which are not home rule units shall have only powers granted to them by law and [certain enumerated] powers…."); *Inland Land Appreciation Fund, L.P. v. County of Kane*, 800 N.E.2d 1232, 1236 (Ill. App. 2003) ("A county is a mere creature of the State and can exercise only the powers expressly delegated by the legislature or those that arise by necessary implication from expressly granted powers." (citation omitted)).[3]

---

[3] Some political subdivisions—such as home rule units—might exercise more autonomy in certain spheres, and infringements on that

No. 21-3334                                                      11

Instead, under the federal Constitution, political subdivisions "have been traditionally regarded as subordinate governmental instrumentalities." *Reynolds*, 377 U.S. at 575. They serve as "convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004), quoting *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607–08 (1991). As a result, we operate under a "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires." *Id.*, citing *Gregory v. Ashcroft*, 501 U.S. 452 (1991). We agree with the district court that neither "or" nor anything else in § 1103(a)(11)(B) shows "an intent to remove this traditional authority of a state over its subdivision." *McHenry County*, 2021 WL 5769526, at *7.

Nor does § 1231(g) support the field preemption argument. The Counties assert that the statute gives the Attorney General the exclusive authority to "arrange for appropriate places of detention" for immigration detainees. § 1231(g)(1). That proves far too little. No one suggests that Illinois could tell the Attorney General of the United States where to house a particular detainee. But the State can remove its own facilities—and those of its subordinate localities—from the list of

---

autonomy might properly be subject to a challenge on State constitutional grounds. See, e.g., Ill. Const. art. VII, § 6 (describing powers unique to home rule units). But the Counties conceded in the district court that they are not home rule units, and they have not raised any claim under the Illinois Constitution. See *McHenry County*, 2021 WL 5769526, at *4.

options. That is evident both because § 1231(g) says nothing about States or local entities and because § 1103(a)(11)(B) contemplates "cooperative agreement[s]" rather than authorizing the Attorney General to *order* State and local governments to house immigration detainees.[4]

The Fifth Circuit's decision in *City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018), illustrates the flaw in the Counties' field preemption argument. There, the policy preferences of State and local governments were a mirror image of this case. A Texas law prohibited local entities from adopting any policy that restricted cooperation in federal immigration enforcement. Several cities and counties challenged the State law on preemption grounds. Those plaintiffs pointed to myriad provisions of federal law regulating local cooperation in the sphere of immigration enforcement. The Fifth Circuit held, however, that those provisions fell far short of establishing field preemption: "Federal law regulates *how* local entities may cooperate in immigration enforcement; [this State law] specifies *whether* they cooperate." *Id.* at 177. None of the federal statutes cited by the plaintiffs evinced any congressional intent "to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *Id.* at 178. The same logic applies here. The Illinois Act is not field preempted.

---

[4] Such a command would raise its own constitutional questions under the anticommandeering doctrine. Cf. *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration enforcement] efforts."); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (noting that "the Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement").

C. *Conflict Preemption*

The Counties also argue that the Act is invalid as a matter of conflict preemption (sometimes referred to as "obstacle" preemption). That doctrine includes "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation and quotation marks omitted). The Counties do not assert any physical impossibility, so the issue is whether the Act obstructs congressional purposes. That inquiry is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). To succeed, the Counties "must show that applying the state law would do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020).

According to the Counties, 8 U.S.C. § 1231(g) shows "a clear preference by Congress" to house immigration detainees in existing facilities instead of constructing new ones. That provision instructs ICE to "consider the availability" of existing detention facilities before "initiating any project for the construction of any new detention facility." § 1231(g)(2). In turn, § 1103(a)(11)(B) authorizes cooperative agreements with States and local entities for immigration detention. The Counties argue that the Act contravenes congressional purposes by preventing the Attorney General from using local detention facilities.

Again, however, these federal statutes simply cannot support the Counties' argument. The text of § 1231(g)

demonstrates at most a general preference to use existing facilities when they are available. But invoking "some brooding federal interest" is not enough to support a preemption claim. *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.); see also *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) (explaining that conflict preemption is not "lightly applied" and does not warrant "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives"), quoting *Chamber of Commerce of United States v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion). A congressional instruction to "consider" available facilities and agreements to use them before building new ones does not preempt a State (or local) government's choice to make certain facilities unavailable.[5]

The Ninth Circuit addressed a similar issue in *United States v. California*, 921 F.3d 865 (9th Cir. 2019). One California law at issue in that case limited the ability of State and local officers to cooperate in federal immigration enforcement. The United States argued that the law was preempted because it obstructed federal immigration statutes. The Ninth Circuit rejected that argument, noting that "the specter of the anticommandeering rule distinguishes the case before us from the preemption cases on which the United States relies." *Id.* at 888. The relevant federal statutes provided "states and localities the *option*, not the *requirement*, of assisting federal

---

[5] The Counties renew their argument that § 1103(a)(11)(B) allows political subdivisions to contract with the federal government even if their parent States prohibit such agreements. But because nothing in the statute attempts to displace the traditional authority States have over their subdivisions, that assertion is no more persuasive here than under field preemption.

No. 21-3334                                                      15

immigration authorities." *Id.* at 889. Federal immigration en-
forcement might have been frustrated by the California law,
but "the choice of a state to refrain from participation cannot
be invalid under the doctrine of obstacle preemption where,
as here, it retains the right of refusal." *Id.* at 890. And the
United States "could not *require* California's cooperation
without running afoul of the Tenth Amendment." *Id.* at 891.

Exactly the same is true here. In drafting § 1103(a)(11)(B)
and § 1231(g), Congress may have hoped or expected that
States would cooperate with any requests from the Attorney
General to house detainees in their facilities. But Illinois and
the other States are not bound by that hope or expectation. See
921 F.3d at 891 (noting that "we must distinguish between ex-
pectations and requirements"). As discussed above,
§ 1103(a)(11)(B) contemplates as much by its reference to "co-
operative agreement[s]." It would make no sense to hold that
a federal statute premised on State cooperation preempts a
State law withholding that cooperation. The Act is not invalid
as a matter of field or conflict preemption.

III. *The Intergovernmental Immunity Challenge*

The Counties' other argument is that the Act violates prin-
ciples of intergovernmental immunity. Again, we review that
question of law de novo. *Nelson*, 928 F.3d at 642.

The intergovernmental immunity doctrine dates to the ca-
nonical federalism decision in *McCulloch v. Maryland*, 17 U.S.
(4 Wheat.) 316 (1819), where the Supreme Court declared un-
constitutional Maryland's attempt to single out the Bank of
the United States for a tax. Today, the doctrine prohibits "state
laws that *either* 'regulat[e] the United States directly *or* dis-
criminat[e] against the Federal Government or those with

No. 21-3334

whom it deals' (*e.g.*, contractors)." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (alterations in original), quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). The Counties argue that the Illinois Act both directly regulates and discriminates against the federal government. Neither argument is persuasive.

A.  *Direct Regulation*

States may not regulate the federal government directly. *North Dakota*, 495 U.S. at 434 (plurality opinion). A direct regulation might arise where a State law or regulation "places a prohibition on the Federal Government." *Hancock v. Train*, 426 U.S. 167, 180 (1976), quoting *Public Utilities Comm'n v. United States*, 355 U.S. 534, 544 (1958); see also *Penn Dairies, Inc. v. Milk Control Comm'n*, 318 U.S. 261, 270 (1943) (noting that state regulation at issue "imposes no prohibition on the national government or its officers"). Or a State might attempt to impose a tax "directly upon the United States." *United States v. New Mexico*, 455 U.S. 720, 733 (1982), quoting *Mayo v. United States*, 319 U.S. 441, 447 (1943).

That is not what the Illinois Act does. It imposes no direct regulation on any federal official or agency. The challenged provision says only that a "law enforcement agency, law enforcement official, or … unit of State or local government" may not enter into or maintain a cooperative agreement for immigration detention. 5 ILCS 805/15(g). To be sure, a consequence of the Act—*the* intended consequence of the Act—is that the federal government will not be able to use cooperative agreements to house immigration detainees in Illinois State or county facilities. But even before the Act was passed, local entities were free to withhold their cooperation or terminate existing agreements. The federal government remains

No. 21-3334                                                        17

free to house immigration detainees in its own facilities in Il-
linois or to contract with private parties. The Act directly reg-
ulates only State and local entities and law enforcement—not
the federal government.[6]

### B. *Discriminatory Treatment*

Nor does the Illinois Act discriminate against the federal
government or its contractors. States may not single those
parties out "for less favorable 'treatment'" or regulate them
"unfavorably on some basis related to their governmental
'status.'" *Washington*, 142 S. Ct. at 1984, quoting first *Washing-
ton v. United States*, 460 U.S. 536, 546 (1983), and then quoting
*North Dakota*, 495 U.S. at 438 (plurality opinion). But a State
law is not unconstitutional merely because it increases costs
for the federal government, "so long as the law imposes those
costs in a neutral, nondiscriminatory way." *Id.*

---

[6] The Act also does not directly regulate the federal government by
applying non-discriminatory regulations to private entities or local gov-
ernments—such as the Counties—that contract with the government. In
*North Dakota*, the Supreme Court addressed two State liquor control regu-
lations that caused out-of-state suppliers to stop shipping liquor to federal
military bases in the State. The Court said the regulations did not raise any
"concerns about direct interference with the Federal Government" be-
cause they operated only "against suppliers, not the Government." 495
U.S. at 437 (plurality opinion). As a result, the regulations could not "be
distinguished from the price control regulations and taxes imposed on
Government contractors that we have repeatedly upheld against constitu-
tional challenge." *Id.* (collecting cases). On the other hand, suppose that
Illinois tried to prohibit private businesses from selling food for federal
immigration detention facilities. That would be a discriminatory regula-
tion aimed at federal contractors and would be invalid under the inter-
governmental immunity doctrine.

The Supreme Court's recent decision in *United States v. Washington* provides a helpful illustration of impermissible discrimination. At issue was a Washington State workers' compensation law that applied only to federal contract workers. The law made it easier for those workers to establish workers' compensation claims, thereby increasing costs for the federal government. The Court concluded that the law violated principles of intergovernmental immunity by "singling out the Federal Government for unfavorable treatment." 142 S. Ct. at 1984. On its face, the law treated federal workers "differently than state or private workers." *Id.* It imposed costs on the federal government that were not imposed on similarly situated State or private employers.

The Illinois Act, by contrast, does not discriminate against the federal government. As explained above, the government still may house immigration detainees in its own facilities or those of private entities. Nor does the Act discriminate among political subdivisions: all counties and other local entities are subject to the same restrictions. And they may continue to provide detention services to the federal government for other detainees. Nothing in the Act suggests that the federal government or its contractors have been singled out "for less favorable 'treatment.'" 142 S. Ct. at 1984 (citation omitted).

To the extent the Counties argue that the Act discriminates against the federal government because it affects an exclusively federal domain, that argument also fails. Differential treatment is critical to a discrimination-based intergovernmental immunity claim. See *Washington*, 460 U.S. at 544–45. ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them."); cf. *North Dakota*, 495 U.S. at

No. 21-3334                                    19

438 (plurality opinion) (framing discrimination inquiry as
whether burden is "imposed equally on other similarly situ-
ated constituents"). In this context, the Counties cannot iden-
tify any actors "similarly situated" to the federal government
that receive more favorable treatment under the Act. The
mere fact that the Act touches on an exclusively federal sphere
is not enough to establish discrimination. Cf. *California*, 921
F.3d at 881 (explaining that intergovernmental immunity "is
not implicated when a state merely references or even singles
out federal activities in an otherwise innocuous enactment").[7]

Finally, the Counties rely on *GEO Group, Inc. v. Newsom*,
15 F.4th 919 (9th Cir. 2021), vacated and rehearing en banc
granted, 31 F.4th 1109 (9th Cir. 2022), but that case highlights
the weakness of the discrimination argument here. The Cali-
fornia statute in *GEO Group* included a general prohibition on
operating private detention facilities. The statute carved out
several exemptions for private state prisons—without compa-
rable exemptions for federal facilities. California, the court
concluded, was "the *only* meaningfully 'favored class'" under

---

[7] In the Counties' view, the Act discriminates against the federal gov-
ernment because it "prohibits the federal government from contracting
with local governments for detention, while the state and other local gov-
ernments remain able to participate in intergovernmental cooperation for
detention services." But that is not an accurate characterization of the Act.
By its terms, the Act applies only to immigration detention services. See 5
ILCS 805/15(g)(2) (requiring termination of agreements "as applied to
housing or detaining individuals for civil immigration violations"). The
federal government—like Illinois and local governments—remains free
"to participate in intergovernmental cooperation" for *other* detention ser-
vices not related to immigration. The State's refusal to cooperate in the
immigration context—a possibility contemplated by the relevant federal
statutes—does not constitute discrimination against the federal govern-
ment.

No. 21-3334

the law. *Id.* at 938, quoting *Dawson v. Steager*, 139 S. Ct. 698,
705 (2019). But see *id.* at 947–52 (Murguia, J., dissenting) (dis-
agreeing with panel majority's intergovernmental immunity
analysis). The same cannot be said of the Illinois Way Forward
Act, which represents only a policy choice by the State not to
cooperate with the federal government's detention operations
in Illinois.

*     *     *

Both the preemption and intergovernmental immunity
challenges fail as a matter of law. The district court properly
granted the motion to dismiss the action for failure to state a
claim.

AFFIRMED.